915 N.E.2d 169 (2009)
DEVELOPMENTAL SERVICES ALTERNATIVES, INC., Appellant,
v.
INDIANA FAMILY AND SOCIAL SERVICES ADMINISTRATION, Appellee.
No. 49A02-0904-CV-335.
Court of Appeals of Indiana.
October 14, 2009.
*172 Paul R. Black, Indianapolis, IN, Attorney for Appellant.
Gregory F. Zoeller, Attorney General of Indiana, Frances Barrow, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

*173 OPINION
CRONE, Judge.

Case Summary
Developmental Services Alternatives, Inc. ("DSA"), appeals the trial court's judgment affirming the order of the administrative law judge ("ALJ") in favor of the Indiana Family and Social Services Administration ("FSSA"). We affirm.

Issues
DSA raises five issues, which we reorder, consolidate, and restate as follows:
I. Whether the trial court erred in trying the case de novo; and
II. Whether the ALJ's order is arbitrary, capricious, and otherwise not in accordance with the law or is unsupported by substantial evidence.

Facts and Procedural History
The facts are undisputed. On or about June 10, 2002, DSA purchased sixteen intermediate care facilities for the mentally retarded ("the Providers") for $3,696,000, pursuant to an asset purchase agreement. The purchase was financed with a loan in the amount of $3,696,000. The Providers are participants in the Medicaid Program, which is administered by FSSA.[1] On August 28, 2003, DSA submitted the Providers' Medicaid costs reports to FSSA's rate-setting contractor, Myers & Stauffer, LLC ("Myers"), for the determination of its Medicaid reimbursement rates, effective April 1, 2003.
On January 5, 2004, Myers issued a rate determination that disallowed the cost of the DSA's intangible assets, designated as "business operations," from the calculation of the capital return factor ("CRF"), upon which Medicaid reimbursement rates are based.[2] These intangible assets include operating licenses and certifications, employment and service and other vendor contracts, software licenses, databases, copyrights, trade names, technology, and all other rights possessed by the seller under which all sixteen of the Providers operated. On February 19, 2004, DSA sent Myers a letter objecting to the disallowance of the cost of intangible assets and related debt and requested reconsideration of the CRF and Medicaid rates. Appellant's App. at 54-58. Myers then requested additional information, which DSA provided.
On May 24, 2004, Myers, by letter, responded to DSA's request for reconsideration, reversed its initial disallowance of the cost of intangible assets and related debt, and recalculated the CRF and Medicaid rates. Id. at 76-79. Subsequently, Clifton Gunderson, LLP, with whom FSSA contracted to audit long-term care facilities, audited DSA. On January 7, 2005, Clifton Gunderson sent FSSA its preliminary audit adjustment for DSA, disallowing the cost of intangible assets as well as the working capital interest expense. The preliminary report provided in relevant part:
Note 1:....
Myers and Stauffer had originally eliminated the [intangible assets] portion of the capital reported on the cost report. However, [DSA] stated Indiana Medicaid Regulation 405 [Indiana Administrative Code] 1-12-16(a), 1-4, as proof that the [intangible assets] are allowable because they are assets with historical cost that are in use, identifiable to patient *174 care, available for physical inspection, and recorded in provider records. In addition, [DSA] provided a list of the legal rights, contracts, agreements, and licensures applicable to each facility. [DSA] has also provided the FAS 141-Business Combinations, stating that amortizable intangible assets may be reported separately for financial accounting purposes. As a result, the rate setter reversed [its] decision and allowed the amounts.
Our response to [DSA's] position is as follows:
The Indiana Medicaid Regulation that [DSA] quoted is in relation to tangible property to be utilized in the computation of the capital return factor. These "business operations" are not depreciable tangible assets; they are amortizable intangible assets. According to the CMS Provider Reimbursement Manual Chapter 12-18(A), we noted that when loans are in excess of the tangible assets acquired, the portion of the loan used to finance the excess is not included in the computation of the provider's equity. The detailed listing of legal rights, contracts, agreements, and licensures noted per facility are all intangible assets. Also, there are allowable expenses related to the items noted which are allowable on the cost report, i.e. licensure fees, salary costs, various contracted service fees, and vendors. If we were to allow these intangible assets to be included on the CRF, the provider would in effect be receiving double reimbursement for the noted items, for example, capitalizing the legal right to the Medicaid Certification of a home on Schedule J and also expensing the certification fees on Schedule E. Furthermore, goodwill is a non-reimbursable intangible asset for Medicaid purposes, and from the documentation received we are unable to determine what, if any, portion of the excess loan amount is attributable to goodwill. We will therefore issue an adjustment to eliminate the entire [intangible assets] amount for the Cost Report on Schedules J and K.
Note 2: Per review of the consultant workpaper, we noted that [DSA] has accumulated the land, building, business operations, equipment, and vehicle expense allocated to the facilities and subtracted that sum from the total loan balance of $3,696,000. The remaining $308,921 has been reported as working capital, and the provider has expensed the interest for that portion of the loan on L401Working Capital Interest of the Medicaid Cost Report. Due to the explanations in note 1, and IRA form 8594 in particular, we do not feel this portion of the loan was obtained for working capital purposes. We will therefore issue an adjustment to eliminate the total working capital expensed on line 401 of the Medicaid Cost Report.
Id. at 84 (citations omitted). Clifton Gunderson provided the final audit report on April 19, 2005, and a rate change notice due to audit adjustment was issued on July 27, 2005. On September 8, 2005, DSA sent Clifton Gunderson a request for reconsideration. Appellee's App. at 233. Clifton Gunderson denied DSA's request.
On October 21, 2005, DSA submitted to FSSA a petition for review and appeal of rate change notice due to audit adjustments and Clifton Gunderson's denial of its request for reconsideration. Id. at 240-41. Both parties moved for summary judgment. In its summary judgment motion, DSA argued that (1) the intangible assets and working capital interest expenses disallowed by the audit were eligible for reimbursement under Medicaid regulations and generally accepted accounting principles ("GAAP"), and (2) Clifton Gunderson inappropriately *175 relied on the CMS Provider Reimbursement Manual, which, according to DSA, governs Medicare and provides no authority for Medicaid reimbursement.[3]Id. at 257-58.
On November 7, 2007, the ALJ issued its order on motions for summary judgment in favor of FSSA, which provided in relevant part:
I. Capital Return Factor

The first issue is whether Clifton Gunderson's disallowance of intangible assets designated as "business expenses" in calculating the capital return factor was done in accordance with [FSSA's] promulgated rules. 405 IAC 1-12-12(a) provides in pertinent part:
Providers ... shall be reimbursed for the use of facilities and equipment, regardless of whether they are owned or leased, by means of a capital return factor. The capital return factor shall be composed of a use fee to cover the use of facilities, land and equipment, and a return on equity. Such reimbursement shall be in lieu of the costs of all depreciation, interest, lease, rent, or other consideration paid for the use of the property. This includes all central office facilities and equipment whose patient or resident care-related depreciation, interest, or lease expense is allocated to the facility. (Emphasis added.)
405 IAC 1-12-16 provides in pertinent part:
(a) The basis used in computing the capital return factor shall be the historical cost of all assets used to deliver patient or resident related services, provided the following:
(1) They are in use.
(2) They are identifiable to patient or resident care.
(3) They are available for physical inspection.
(4) They are recorded in provider records. If an asset does not meet all of the requirements prescribed in this section, the cost and any associated property financing(s) or capital lease(s) shall not be included in computing the capital return factor. (b) The provider shall maintain detailed property schedules to provide a permanent record of all historical costs and balances of facilities and equipment.
Reading these provisions together and noting the continuous reference throughout the rules to "facilities and equipment" provides an understanding of the type of assets which are meant to be considered in the Capital Return Factor. The intangible assets that DSA designated as "business operations" were properly removed from the capital return factor calculation. On this issue, therefore, Summary Judgment should be entered for [FSSA].
II. Working Capital Interest Expense

The second issue is whether Clifton Gunderson's adjustment to DSA's rate to eliminate the working capital interest expense claimed by DSA was proper. DSA failed to provide documentation that the loan at issue was an operating loan; therefore, Clifton Gunderson's adjustment to eliminate the working capital interest expenses was not improper.
Appellant's App. at 23-24.
On November 21, 2007, DSA submitted to FSSA an objection to order on motions *176 for summary judgment. On December 31, 2007, FSSA issued its decision of ultimate authority, affirming the ALJ's order. The decision stated:
After reviewing the decision of the [ALJ][] and the submittals from both parties, and giving due consideration thereto, I did not find that the decision of the [ALJ] was arbitrary, capricious, an abuse of discretion or otherwise unreasonable. I also did not find a failure to base it upon substantial and reliable evidence or that it was clearly erroneous on the basis of being contrary to applicable Federal and State law.
In addition, in reviewing the submittals and evaluating the arguments of the parties, I have myself concluded that DSA has placed undue emphasis on tortured interpretations of 405 IAC 1-12-3(a), 405 IAC 1-12-12(a) and a 2005 memorandum from the HHS Office of Inspector General. Their lengthy arguments collapse upon simple review of those IAC Sections and that memorandum.
Id. at 20.
On January 30, 2008, DSA filed with the trial court a petition for judicial review of FSSA's decision of ultimate authority. On September 3, 2008, DSA filed a motion for summary judgment. On March 13, 2009, the trial court issued findings of fact, conclusions thereon, and judgment, affirming the decision of the ultimate authority and denying DSA's petition for judicial review. DSA appeals.

Discussion and Decision[4]

Standard of Review
In an appeal involving a decision of an administrative agency, our standard of review is governed by the Administrative Orders and Procedures Act ("AOPA"), and we are bound by the same standard of review as the trial court. Ind.-Ky. Elec. Corp. v. Comm'r, Ind. Dep't of Envtl. Mgmt., 820 N.E.2d 771, 776 (Ind.Ct.App. 2005). When a court reviews a decision from an administrative agency, the reviewing court may neither try the case de novo nor substitute its judgment for that of the agency. Ind.Code § 4-21.5-5-11. Judicial review of disputed issues of fact must be confined to the agency record for the agency action. Id. Further, we will not reweigh the evidence. Ind. Dep't of Envtl. Mgmt. v. Adapto, Inc., 717 N.E.2d 646, 649 (Ind.Ct.App.1999). We give deference to the expertise of the administrative body, and will reverse the agency's decision only if it is
(1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
(2) contrary to a constitutional right, power, privilege, or immunity;
(3) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
(4) without observance of procedure required by law; or
(5) unsupported by substantial evidence.
Ind.Code § 4-21.5-5-14(d). "A decision is arbitrary and capricious when it is made without any consideration of the facts and lacks any basis that may lead a reasonable person to make the same decision made by the administrative agency." Ind. Dep't of Envtl. Mgmt. v. Schnippel Constr., Inc., 778 N.E.2d 407, 412 (Ind.Ct.App.2002), trans. denied (2003). The burden of demonstrating the invalidity of an agency action is on the party asserting its invalidity. Ind.Code § 4-21.5-5-14(a).

*177 I. Trial Court's Review of ALJ's Order

DSA asserts that the trial court erred in conducting a de novo review and asks that we disregard certain of the trial court's conclusions of law. The DSA's argument can be summarized as follows: The ALJ's order is deficient in its findings,[5] and therefore, certain of the trial court's conclusions of law are necessarily based on matters outside the ALJ's order, demonstrating that the trial court conducted a de novo review.
DSA claims that the ALJ failed to designate the issues and claims upon which it found no genuine issue of material fact in violation of Indiana Code Section 4-21.5-3-23. Section 4-21.5-3-23 governs summary judgment motions before the ALJ and provides in relevant part:
A summary judgment may be rendered upon fewer than all the issues or claims (such as the issue of penalties alone) although there is a genuine issue as to damages or liability, as the case may be. A summary judgment upon fewer than all the issues involved in a proceeding or with respect to fewer than all the claims or parties is not a final order. The administrative law judge shall designate the issues or claims upon which the judge finds no genuine issue as to any material facts.

Ind.Code § 4-21.5-3-23(b).
We observe that here the ALJ did not render judgment on fewer than all the issues or claims, and therefore it was unnecessary to designate those issues or claims upon which judgment was rendered. In any event, the ALJ's order specifically sets forth the two issues upon which it rendered judgment and resolved the case: "The first issue is whether Clifton Gunderson's disallowance of intangible assets designated as `business expenses' in calculating the capital return factor was done in accordance with [FSSA's] promulgated rules[;]" and "The second issue is whether Clifton Gunderson's adjustment to DSA's rate to eliminate the working capital interest expense claimed by DSA was proper." Appellant's App. at 23-24. We conclude that the ALJ's order did not violate Indiana Code Section 4-21.5-3-23.
Next, DSA asserts that the ALJ failed to separately state findings of fact for all aspects of its order and the basic facts to support its findings of ultimate fact in violation of Indiana Code Section 4-21.5-3-27. Section 4-21.5-3-27(c) provides that "[f]indings of ultimate fact must be accompanied by a concise statement of the underlying basic facts of record to support the findings." Further, 4-21.5-3-27(d) provides:
Findings must be based exclusively upon the evidence of record in the proceeding and on matters officially noticed in that proceeding. Findings must be based upon the kind of evidence that is substantial and reliable. The administrative law judge's experience, technical competence, and specialized knowledge may be used in evaluating evidence.
As the evidence was undisputed and the questions presented were purely those of law, the ALJ's order was not rendered unfit for meaningful review due to the absence of findings of fact. The ALJ set forth the specific Medicaid regulations at issue and explained its application of those regulations, thereby adequately explaining its decision. As such, the ALJ's order does not contravene Section 4-21.5-3-27. *178 Accordingly, DSA has failed to show that the ALJ's order is deficient.
As to the trial court's review of the ALJ's order, we recognize that in reviewing an agency decision, "a court is not to try the facts de novo or substitute its own judgment for that of the agency."[6]Rice v. Allen County Plan Comm'n, 852 N.E.2d 591, 597 (Ind.Ct.App.2006), trans. denied (2007). However, the only issues in this case are purely questions of law. See Appellee's App. at 257 (DSA's motion for summary judgment) ("The question in this appeal concerns only the construction of federal and state statues [sic] and regulations."). Thus, there are simply no disputed facts that the trial court could try de novo.[7]
In addition, the trial court did not substitute its judgment for that of the agencythe trial court affirmed the agency's interpretation of the relevant regulations. The conclusions of law of which DSA complains all pertain to the interpretation of the relevant regulations and bolster the FSSA's interpretation. As such, they do not involve matters outside the ALJ's order. We find no error here.
Finally, we apply de novo review to questions of law, and therefore we owe no deference to the trial court on such inquiries. See Kiel Bros. Oil Co. v. Ind. Dep't of Envtl. Mgmt., 819 N.E.2d 892, 902 (Ind.Ct.App.2004), trans. denied (2005). As such, DSA's complaints regarding the trial court's conclusions of law have no effect on our review of the ALJ's order.

II. ALJ's Order

A.
DSA contends that the ALJ's order violates the principles of res judicata and collateral estoppel because Myers's rate determination constituted a final agency action pursuant to Indiana Code Section 4-21.5-1-6, thereby barring Clifton Gunderson's subsequent rate adjustment.[8] FSSA asserts that DSA waived the issue by failing to raise it before the agency.
"A party may only obtain judicial review of an issue that was raised before the administrative agency and preserved for review[.]"[9]Ind. Educ. Employment Relations Bd. v. Tucker, 676 N.E.2d 773, 776 (Ind.Ct.App.1997); see also Ind.Code § 4-21.5-5-10 (limiting judicial review of issues not raised before the agency); 405 IAC 1-1.5-2(e) (requiring that request for appeal set out in detail "the specific findings, action, or determinations of the office from which the provider is appealing" and "why the provider believes that the office's determination was in error[,]" as well as "all statutes or rules supporting the provider's *179 contentions of error"); and 405 IAC 1-1.5-2(f) (providing that the statement of issues shall govern the scope of the issues to be adjudicated and that the provider will not be permitted to expand the appeal beyond the statement of issues). DSA contends that it did raise the issue before FSSA in its October 21, 2005, petition for review by informing FSSA that "Myers & Stauffer had previously determined that under applicable authority that these [intangible] assets were eligible for Medicaid reimbursement." Appellee's App. at 241. DSA made the same statement regarding the working capital interest expense. Id. However, the simple statement that the rate setter had made a rate determination is not equivalent to an argument that because the rate setter had made a rate determination any subsequent adjustments were barred by principles of res judicata and collateral estoppel. We conclude that DSA has waived this issue.
Waiver notwithstanding, DSA's argument is unavailing. The doctrine of res judicata operates to preclude the litigation of matters that have already been litigated. In re Adoption of Baby W., 796 N.E.2d 364, 373 (Ind.Ct.App.2003), trans. denied (2004).
The principle of res judicata is divided into two branches: claim preclusion and issue preclusion. Claim preclusion applies where a final judgment on the merits has been rendered which acts as a complete bar to a subsequent action on the same issue or claim between those parties and their privies. Issue preclusion, also referred to as collateral estoppel, bars the subsequent relitigation of the same fact or issue where the fact or issue was necessarily adjudicated in a former suit and the same fact or issue is presented in a subsequent action.
Id. (citations omitted) (emphases added).
When a party argues that the claim preclusion component of res judicata applies, four factors must be present, namely:
(1) the former judgment must have been rendered by a court of competent jurisdiction; (2) the former judgment must have been rendered on the merits; (3) the matter now in issue was, or could have been, determined in the prior action; and (4) the controversy adjudicated in the former action must have been between parties to the present suit or their privies.
Indpls. Downs, LLC v. Herr, 834 N.E.2d 699, 703 (Ind.Ct.App.2005), trans. denied (2006).
We disagree with DSA's assertion that Myers's rate determination was a final agency action pursuant to Indiana Code Section 4-21.5-1-6. That section defines "final agency action" as "(1) the entry of an order designated as a final order under this article; or (2) any other agency action that disposes of all issues in a proceeding for all parties after the exhaustion of all available administrative remedies concerning the action." Ind.Code § 4-21.5-1-6. Also, Indiana Code Section 4-21.5-3-27(a) provides,
If the administrative law judge is the ultimate authority for the agency, the ultimate authority's order disposing of a proceeding is a final order. If the administrative law judge is not the ultimate authority, the administrative law judge's order disposing of the proceeding becomes a final order when affirmed [by the ultimate authority or its designee].[[10]]
*180 Thus, pursuant to Indiana Code Sections 4-21.5-1-6 and 4-21.5-3-27(a), the ALJ's order, after being affirmed by the FSSA's ultimate authority, is FSSA's final agency action. In addition, Myers's rate determination did not exhaust all of DSA's available administrative remedies. If the Medicaid reimbursement rate set by Myers had been unsatisfactory to DSA following its request for reconsideration, DSA could have appealed the determination to the ALJ. See Ind.Code § 4-21.5-3-7 (setting forth requirements for appeal of a specific finding, action, or determination of the office of Medicaid policy and planning or a contractor thereof); see also 405 IAC 1-1.5 (governing appeal procedures for providers).
Further, "`whether an administrative determination is capable of being res judicata depends on the nature of the administrative action involved, and the doctrine of res judicata has been applied to administrative action that has been characterized by the courts as adjudicatory, judicial, or quasi-judicial.'" Ind. Gas Co. v. Office of Util. Consumer Counselor, 610 N.E.2d 865, 869-70 (Ind.Ct.App.1993) (quoting South Bend Fed'n of Teachers v. Nat'l Educ. Ass'n, 180 Ind.App. 299, 315, 389 N.E.2d 23, 33 (1979)). In Hartman v. Keri, 883 N.E.2d 774 (Ind.2008), Justice Rucker, concurring in result, noted the following:
While it is difficult, if not impossible, to define quasi-judicial power and to discriminate between judicial and administrative acts in a way which will be applicable to every case, we find it is the nature, quality, and purpose of the act performed, rather than the name or character of the officer or board which performs it, which determines its character as judicial. Generally, the judicial function consists of: (1) the presence of the parties upon notice; (2) the ascertainment of facts; (3) the determination of the issues; and, (4) the rendition of a judgment or final order regarding the parties' rights, duties, or liabilities.
Id. at 781 (quoting Lincoln v. Bd. of Comm'rs of Tippecanoe County, 510 N.E.2d 716, 721 (Ind.Ct.App.1987), abrogated on other grounds by McDillon v. N. Ind. Pub. Serv. Co., 841 N.E.2d 1148, 1152 (Ind.2006)) (Rucker J., concurring) (emphasis added).
Myers's rate setting process, including its reconsideration of its initial disallowance of the cost of intangible assets in its calculation of the CRF is not adjudicatory, judicial, or quasi-judicial in nature. We further note that DSA's position would render the auditing procedures meaningless because the auditor would have no authority to make corrections to the rate setter's determination. Accordingly, we reject DSA's argument that the ALJ's order violates principles of res judicata and collateral estoppel.[11]

*181 B.

DSA also asserts that the trial court[12] erred in refusing to allow Medicaid reimbursement for intangible assets in violation of the plain language of 405 IAC 1-12-16(a). In addition to that section, 405 IAC 1-12-12(a), cited by the ALJ, is necessary to our review. When interpreting administrative regulations, we apply the same rules of construction that apply to statutes. U.S. Outdoor Adver. Co. v. Ind. Dep't of Transp., 714 N.E.2d 1244, 1256 (Ind.Ct.App.1999), trans. denied (2000).
An interpretation of a statute by an administrative agency charged with the duty of enforcing the statute is entitled to great weight, unless this interpretation would be inconsistent with the statute itself. .... Deference to an agency's interpretation of a statute becomes a consideration when a statute is ambiguous and susceptible of more than one reasonable interpretation. When a court is faced with two reasonable interpretations of a statute, one of which is supplied by an administrative agency charged with enforcing the statute, the court should defer to the agency. If a court determines that an agency's interpretation is reasonable, it should terminate its analysis and not address the reasonableness of the other party's proposed interpretation. Terminating the analysis recognizes the general policies of acknowledging the expertise of agencies empowered to interpret and enforce statutes and increasing public reliance on agency interpretations. However, an agency's incorrect interpretation of a statute is entitled to no weight. If an agency misconstrues a statute, there is no reasonable basis for the agency's ultimate action and the trial court is required to reverse the agency's action as being arbitrary and capricious.
Pierce v. State Dep't of Correction, 885 N.E.2d 77, 89 (Ind.Ct.App.2008) (citations and quotation marks omitted).
The primary goal in statutory construction is to determine, give effect to, and implement the legislature's intent. Cox v. Cantrell, 866 N.E.2d 798, 805 (Ind.Ct.App. 2007), trans. denied. "To effectuate legislative intent, we read the sections of an act together in order that no part is rendered meaningless if it can be harmonized with the remainder of the statute." City of Carmel v. Steele, 865 N.E.2d 612, 618 (Ind. 2007). "[T]he statute or regulation must be construed as a whole looking to its object and policy." Partlow v. Ind. Family & Soc. Servs. Admin., 717 N.E.2d 1212, 1214-15 (Ind.Ct.App.1999). "Words and phrases are taken in their plain, ordinary, and usual meaning unless a different purpose is manifested by the statute." JKB, Sr. v. Armour Pharm. Co., 660 N.E.2d 602, 605 (Ind.Ct.App.1996), trans. denied. Further, we presume that the legislature intended logical application of the language used in the statute, so as to avoid unjust or absurd results. Bowyer v. Ind. Dep't of Natural Res., 882 N.E.2d 754, 759 (Ind.Ct. App.2008).
405 IAC 1-12-12(a) reads in relevant part:
Providers ... shall be reimbursed for the use of facilities and equipment, regardless of whether they are owned or leased, by means of a capital return factor. The capital return factor shall be composed of a use fee to cover the *182 use of facilities, land and equipment, and a return on equity. Such reimbursement shall be in lieu of the costs of all depreciation, interest, lease, rent, or other consideration paid for the use of the property. This includes all central office facilities and equipment whose patient or resident care-related depreciation, interest, or lease expense is allocated to the facility.
(Emphases added).[13]
The 2007 version of 405 IAC 1-12-16 provided as follows:
(a) The basis used in computing the capital return factor shall be the historical cost of all assets used to deliver patient or resident related services, provided the following:
(1) They are in use.
(2) They are identifiable to patient or resident care.
(3) They are available for physical inspection.
(4) They are recorded in provider records.
If an asset does not meet all of the requirements prescribed in this section, the cost and any associated property financing(s) or capital lease(s) shall not be included in computing the capital return factor.
(b) The provider shall maintain detailed property schedules to provide a permanent record of all historical costs and balances of facilities and equipment.....
(c) Assets used in computing the capital return factor shall include only items currently used in providing services customarily provided to patients or residents.
(Emphases added).[14]
DSA contends that the ALJ misinterpreted "all assets" to mean only facilities and equipment. DSA argues that "`[a]ll assets,' whether considered plain English, or technical accounting language expressed by generally accepted accounting principles (`GAAP'), clearly include intangible assets." Appellant's Br. at 25. DSA's argument ignores the rule of construction that "a regulation must be construed as a whole looking to its object and policy."
See Partlow, 717 N.E.2d at 1214-15. We observe that the CRF is a term specifically defined in the Medicaid regulations, not by GAAP.[15] Pursuant to 405 IAC *183 1-12-12(a), the CRF is a use fee to cover the use of facilities, land and equipment, and a return on equity. In addition, 405 IAC 1-12-16(b) requires that records be kept for all historical costs ... of facilities and equipment. Finally, as we read through 405 IAC 1-12, we note the many references to facilities and equipment, which indicate that these types of assets are to be included in the CRF calculation. Thus, DSA's interpretation of "all assets" does not comport with the intent of the Medicaid regulations.[16] We conclude that DSA has failed to carry its burden of showing that FSSA's interpretation of the Medicaid regulations is unreasonable.

C.
Next, DSA argues that the trial court erred in concluding that FSSA properly applied the Medicare Regulations and the Medicare Provider Reimbursement Manual to determine whether to include intangible assets to calculate the CRF. See Appellant's App. at 15 (trial court's judgment, conclusion of law 31). This argument is irrelevant to our review of the ALJ's order. First, we owe no deference to the trial court on questions of law, see Kiel Bros., 819 N.E.2d at 902, and second, the ALJ did not make a determination on whether FSSA properly relied on the Medicare Regulations and the Medicare Provider Reimbursement Manual. DSA raised two issues on summary judgment: (1) "The disallowances of the Provider's costs of intangible assets, related loans and working capital interest in determining the Providers' Medicaid reimbursement violates the plain language of the Medicaid regulations which unambiguously allow Medicaid reimbursement for such costs[;]" and (2) "Clifton Gunderson erred when it disallowed the Providers' costs of intangible assets, related loans and working capital interest based upon the Medicare Provider Reimbursement Manual." Appellee's App. at 257-58. The ALJ determined that the disallowance of intangible assets in calculating the CRF was done in accordance with 405 IAC 1-12-12(a) and 1-12-16. Therefore, the ALJ did not need to reach the second issue regarding Clifton Gunderson's reliance on the Medicare manual. As to the working capital interest expense, the ALJ found that there was no documentation showing that the loan was an operating loan. Here again, the ALJ did not need to reach the second issue. Accordingly, this issue is not reviewable.

D.
Finally, DSA contends that the ALJ's order is based on post hoc rationalization, and therefore is unsupported by substantial evidence and is arbitrary, capricious, and in violation of legal principles. A post hoc rationalization is an explanation offered in support of a decision after that decision has been made. Clark v. State Bd. of Tax Comm'rs, 742 N.E.2d 46, 49(Ind. Tax Ct.2001).
Specifically, DSA asserts that the justifications given by Clifton Gunderson in support of its decision to exclude intangible assets and working capital interest expense as set forth in its January 7, 2005, *184 preliminary report were not the same as those presented to the ALJ and upon which the ALJ's order is based. DSA claims that
As post hoc rationalization for its [adjustment], Clifton Gunderson[[17]] testified under oath that it disallowed DSA's Intangible Asset and Related Debt Costs (from the calculation of the [Providers'] capital return factor) solely because the assets in issue were intangible. Clifton Gunderson testified that "[FSSA]'s position ... that Clifton Gunderson enforces" is "that only assets that are depreciable tangible assets are allowable as part of the calculation of a provider's capital return factor."
Appellant's Br. at 23-24 (footnotes omitted). However, Clifton Gunderson's January 7, 2005, report states, "The Indiana Medicaid Regulation that [DSA] quoted, [405 IAC 1-12-16(a)], is in relation to tangible property to be utilized in the computation of the capital return factor. These `business operations' are not depreciable tangible assets; they are amortizable intangible assets." Appellant's App. at 84. Thus, we see that the reasons Clifton Gunderson presented to the ALJ to support the disallowance of intangible assets can be found in its initial report. With regard to intangible assets, Clifton Gunderson did not present a post hoc rationalization to the ALJ.
As to the working capital interest expense, DSA contends that
FSSA's audit contractor conceded that prior to issuing its Final Audit Reports, it did not ask DSA for any documentation other than that which it had audited, and upon which Myers and Stauffer had allowed reimbursement and, that, without doing so, DSA would not have known that Clifton Gunderson wanted additional documentation. FSSA's audit contractor also expressly acknowledged under oath that it was "post hoc rationalization [for it] to raise documentation issues" after it issued its Final Audit Reports.
Appellant's Br. at 21 (footnotes omitted). We observe that Clifton Gunderson's January 7, 2005, report indicated that it reviewed the loan document, the purchase agreement, IRS Form 8594, and consultant workpapers. Appellant's App. at 83. Based on these documents, Clifton Gunderson determined that it was going to eliminate the working capital interest expense because they did not show that any portion of the loan was obtained for working capital. Id. at 84. Thus, the preliminary report supports the ALJ's conclusion that DSA failed to provide documentation that the loan at issue was an operating loan.[18] The ALJ's order is not based on post hoc rationalizations in this respect either.
Even if the ALJ's order was based on reasons not previously considered in FSSA's Medicaid rate setting process and considered for the first time during the hearing, such a feature, standing alone, would not render the ALJ's order arbitrary and capricious. DSA misconstrues the rule barring post hoc rationalizations. Our review of Indiana case law shows that the Indiana Tax Court has often dealt with post hoc rationalizations in conjunction with administrative agency action, and these cases illustrate that it is the reviewing court, and not the administrative agency, that is barred from considering post hoc rationalizations.
*185 In Scheid v. State Board of Tax Commissioners, 560 N.E.2d 1283 (Ind. Tax Ct.1990), a taxpayer sought review of a decision of the State Board of Tax Commissioners ("the State Board") denying a petition for reassessment for property destroyed by a fire. The State Board denied Scheid's petition for reassessment because "the fire was not a disaster." Id. at 1283. On appeal, Scheid contended that the Board erred in denying his petition because the fire that destroyed his property was a disaster. In response, the State Board argued that a reassessment can be conducted only "1) when a substantial amount of real and personal property in a township has been destroyed, which means a substantial amount of the township's total property, and 2) when such property is destroyed by a disaster, and that a fire is a disaster only when it is a widespread fire[,]" and that, in Scheid's case, a substantial amount of property in the township had not been partially or totally destroyed.
In reviewing the State Board's argument, Judge Fisher observed,
The State Board's motion for summary judgment is based solely upon the contention that a "substantial amount" of property in the township has not been partially or totally destroyed. The State Board neither based its final determination on this reason in denying Scheid's petition for reassessment nor addressed the issue in any manner at the administrative level. The State Board first raised this issue upon filing its motion for summary judgment in this court.

In Hoosier Energy Rural Electric Cooperative, Inc. v. Indiana Department of State Revenue (1988), Ind. Tax, 528 N.E.2d 867, 869, this court held that its scope of review extended beyond issues argued at the administrative level because the appeal was to be heard de novo, that is, all evidence admissible could be presented for the first time before the court. Blood v. Poindexter (1988), Ind. Tax, 524 N.E.2d 824, 825. The court's scope of review in the case at bar, however, is limited to:
a consideration of whether or not there is any substantial evidence to support the findings and order of the administrative body. A court may also determine whether or not the action constitutes an abuse of discretion and is arbitrary or capricious, as revealed by the uncontradicted facts.
In order for the reviewing court to do this limited task, it is of course, necessary that written findings be before the court. Stokely-Van Camp, Inc. v. State Bd. of Tax Comm'rs (1979), 182 Ind.App. 91, 94, 394 N.E.2d 209, 211 (citations omitted).
A written finding is before the court. Nevertheless, the State Board raises here for the first time an additional reason for denying the reassessment. There are no written findings before the court pertaining to this newly raised reason. An agency generally may not support its determination by referring to reasons which are not ruled on previously but which are offered as post hoc rationalizations. Id. at 1284 (citing Burlington Truck Lines, Inc. v. U.S., 371 U.S. 156, 168-69, 83 S.Ct. 239, 245-46, 9 L.Ed.2d 207 (1962)).
Id. at 1284 (footnote omitted) (emphases added).[19]
*186 The rule barring post hoc rationalizations as announced in Scheid is now well established in Indiana. See, e.g., 20th Century Fiberglass v. State Bd. of Tax Comm'rs, 683 N.E.2d 1376, 1377 (Ind. Tax Ct.1997) (refusing to allow State Board to support its denial of Form 133 petition based on failure to file valid power of attorney when that issue was not raised in administrative proceeding nor mentioned in State Board's written findings); Canal Sq. Ltd. P'ship v. State Bd. of Tax Comm'rs, 694 N.E.2d 801, 808 (Ind. Tax Ct.1998) (declining to consider issue regarding an error in appraisal study because issue was not raised in administrative proceeding and was not referred to in written findings of final assessment); Word of His Grace Fellowship, Inc. v. State Board of Tax Comm'rs, 711 N.E.2d 875 (Ind. Tax Ct.1999) (declining to consider State Board's argument that not-for-profit corporation was not proper party to apply for property tax exemption where State Board did not base its denial of petition for property tax exemption on that rationale); Clark, 742 N.E.2d at 49 (reversing State Board where its final determination contained no rationale for adjusting the subject's units' grade adjustment and it explained its rationale for the first time at trial).
The purpose of the rule prohibiting administrative agencies from supporting their actions with post hoc rationalizations after litigation has commenced was aptly stated in Word:
[T]he State Board did not base its denial of the exemption in this case on the fact that Word was not the proper party to apply for the exemption. Rather, the State Board is attempting to raise this issue for the first time in this original tax appeal. It is well-settled that the State Board, in general, may not support a final determination by referring to reasons that were not previously ruled upon, but that are offered as post hoc rationalizations.

This rule emanates from the limited nature of the scope of judicial review of administrative agency decisions in general and the limited nature of this Court's review of State Board final determinations in particular. In addition, the Court notes that this rule fosters the issuance of well-considered and thorough decisions by administrative agencies and is in keeping with the expertise presumed to be possessed by those agencies. Furthermore, if administrative agencies could issue decisions confident in their ability to offer post hoc rationalizations, the quality of the decisionmaking would likely suffer, thus placing a more difficult burden on courts exercising judicial review. Lastly, this rule can prevent parties from suffering unnecessary legal expense and at the same time promote judicial economy. If an administrative agency is permitted to save a winning legal argument in support of its decision until judicial review of its decision rather than articulating that argument contemporaneously with its decision, then parties may embark on lawsuits that would not have been undertaken had the administrative agency articulated that argument in the first place. In an era where judicial resources are scarce, any rule that promotes fewer lawsuits is particularly compelling.
711 N.E.2d at 878-79 (citations and footnote omitted).
Our review of the law in other jurisdictions shows that Indiana's formulation and application of the rule barring agency post hoc rationalization from consideration by *187 the judiciary is typical of the prevailing view, which applies generally to judicial review of all administrative agencies. Securities & Exchange Commission v. Chenery Corp., 332 U.S. 194, 67 S.Ct. 1760, 91 L.Ed. 1995 (1947), is frequently cited to support judicial disregard of agency justifications prepared for litigation. In Chenery, the Supreme Court stated,
[A] simple but fundamental rule of administrative law ... is to the effect that a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency. If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis. To do so would propel the court into the domain which Congress has set aside exclusively for the administrative agency.
[A]n important corollary of the foregoing rule [is that i]f the administrative action is to be tested by the basis upon which it purports to rest, that basis must be set forth with such clarity as to be understandable. It will not do for a court to be compelled to guess at the theory underlying the agency's action; nor can a court be expected to chisel that which must be precise from what the agency has left vague and indecisive. In other words, [w]e must know what a decision means before the duty becomes ours to say whether it is right or wrong.
Id. at 196-97, 67 S.Ct. 1760; see also Burlington, 371 U.S. at 168-69, 83 S.Ct. 239 ("The courts may not accept appellate counsel's post hoc rationalizations for agency action; Chenery requires that an agency's discretionary order be upheld, if at all, on the same basis articulated in the order by the agency itself[.]"); see also 2 CHARLES H. KOCH, JR., ADMINISTRATIVE LAW & PRACTICE § 8.22 (2d ed. 1997) ("The number of cases rejecting agency efforts to justify actions after the fact shows the strength of the prohibition against post hoc rationalization.") and cases cited therein.[20]
Here, DSA is not arguing that the reasons FSSA presented to the trial court, and now to us, to support the ALJ's order are different from those upon which the order is based. Rather, DSA argues that the reasons Clifton Gunderson presented to the ALJ were different from those in its preliminary report. However, neither Myers's determination of DSA's reimbursement rate nor Clifton Gunderson's adjustment was a final agency order. In effect, DSA asks us to apply the rule barring a reviewing court's consideration of post hoc rationalizations to an administrative agency before an agency has issued a final order and to the agency decisionmaking process itself.
Whether the rule barring post hoc rationalizations is applicable to an administrative process before a final agency order has been issued was addressed in Independence Mining Company, Inc. v. Babbitt, 105 F.3d 502 (9th Cir.1997). In Babbitt, Independence Mining Company, Inc. *188 ("IMC"), appealed the district court's denial of its motion seeking a writ of mandamus or an order compelling the Secretary of the Interior to determine the validity of its mineral patent claims and, if appropriate, issue patents for the claims. IMC contended that the district court erred in denying its motion because IMC had shown that the Secretary had enacted certain changes to the procedures for processing mineral patent applications that purposely delayed the process. IMC also argued that the district court erred in relying on the Secretary's allegedly post hoc explanations for enacting one of those changes. As to that latter argument, the Babbitt court responded as follows:
IMC mistakes the government's supplemental evidence submitted on reconsideration as a post hoc rationalization. The rule barring consideration of post hoc agency rationalizations operates where an agency has provided a particular justification for a determination at the time the determination is made, but provides a different justification for that same determination when it is later reviewed by another body. However, this rule has been developed in the context of a court's duty to set aside a "final agency decision" if based on a post hoc rationalization. Such a "final agency decision," generally required for judicial review of agency actions, provides the court with a date certain by which it can analyze the agency's justifications. It also identifies the particular decision being challenged and the justifications proffered at that time.
Judicial review of an agency's actions under § 706(1) for alleged delay has been deemed an exception to the "final agency decision" requirement. Under this exception, the court is examining an agency's actions prior to a final agency decision for purposes of measuring agency delay. Accordingly, there is no date certain by which to evaluate an agency's justifications for its actions. Moreover, without a "final agency decision," there is no official statement of the agency's actions and relevant justifications. [The Department of Interior Solicitor]'s declaration was not a post hoc rationalization. It was merely supplemental evidence submitted in support of appellee's position on IMC's motion for reconsideration. Accordingly, the district court was not prohibited from considering it, especially where the court permitted both sides to submit supplemental evidence. There was no reliance on any post hoc rationalizations in this case.
Id. at 511-12.
Although Babbitt does not directly address the circumstances present here, it stands for the proposition that a reviewing court is not barred from considering agency justifications concerning an agency process when a final agency order culminating from that process has not yet been issued. DSA presents us with no case law to support its theory that an agency is limited as to the justifications it may articulate during its administrative proceedings before a final order is issued. DSA cites People of State of Illinois v. U.S., 666 F.2d 1066, 1077 (7th Cir.1981), and First Union Bank & Trust Company of Winamac, Indiana v. Heimann, 600 F.2d 91, 96 (7th Cir. 1979), cert. denied, for the proposition that a "Court must judge the agency's decision on the bases articulated by the agency at the time of the decision, not those articulated after the fact by its lawyers." Appellant's Br. at 23. In People, the court made the aforementioned statement after noting that it could not accept appellate counsel's post hoc rationalizations for agency action. 666 F.2d at 1077. In First Union, the court was reviewing the Comptroller of Currency's written opinion issued *189 after the district court had remanded for explanation because the comptroller's first opinion was inadequate for judicial review. 600 F.2d at 95. Therefore, the First Union court noted that the explanation given on remand was to be reviewed critically because, having been prepared during the course of the litigation, the explanation was to some extent post hoc rationalization. Id. at 96.[21] Thus, in both cases, the courts refer to post hoc rationalizations as explanations provided in justifying an agency decision after litigation has commenced. Neither case supports DSA's position.
The purposes of the rule barring courts from considering post hoc rationalizations, i.e., to promote agency decisions based on sound reasoning, enable meaningful judicial review of agency actions, preserve agency authority as intended by the legislature, limit unnecessary litigation, and conserve judicial resources, are not served by applying it to the agency decisionmaking process before a final agency order is issued. Further, if we were to apply the rule as DSA would have us, the administrative decisionmaking process would be impaired. An administrative agency would have only one chance of getting the right answer and would have no opportunity for fully exploring all the ramifications of an action. We see no reason to apply the post hoc rationalization rule to an administrative agency during its decisionmaking process. Accordingly, we conclude that DSA has failed to carry its burden to show that the ALJ's order is arbitrary, capricious, not in accordance with the law, or unsupported by substantial evidence. Therefore, we affirm the trial court.
Affirmed.
MAY, J., and BROWN, J., concur.
NOTES
[1] Specifically, the Medicaid program is administered by FSSA's Office of Medicaid Policy and Planning.
[2] Myers's initial determination of DSA's Medicaid reimbursement rate is not in the record before us.
[3] In its appellant's appendix, DSA failed to include its entire brief in support of its motion for summary judgment as required by Indiana Appellate Rule 50(f). We thank FSSA for including it in its appellee's appendix.
[4] We admonish appellant's and appellee's counsel to proofread their briefs more diligently. A number of citations to the Indiana Administrative Code and the Administrative Order and Procedures Act were incorrect and hindered our review.
[5] Although we may reverse an agency order that is unsupported by substantial evidence, see Indiana Code Section 4-21.5-5-14, DSA does not argue that we should reverse the ALJ's order because it fails to set forth findings of fact.
[6] In fact, "[t]he review court, when reviewing the decision of an administrative agency, simply does not have the power to enter findings of fact, and as such, its findings shall be ignored." Moore v. Ind. Family & Social Servs. Admin., 682 N.E.2d 545, 547 (Ind.Ct. App.1997).
[7] In fact, DSA has not challenged any of the trial court's findings of fact.
[8] DSA mistakenly bases its argument on the trial court's order rather than the ALJ's order. The standard of review set forth in Indiana Code Section 4-21.5-5-14(d) is specifically applicable to "agency action," and we review the decision of an administrative agency by the same standard as the trial court. Ind.-Ky. Elec. Corp., 820 N.E.2d at 776.
[9] There are two exceptions to this rule, neither of which is applicable here: (1) where the issue concerns whether a person who was required to be notified of the proceeding was notified in substantial compliance with the statute, and (2) where the interests of justice would be served by judicial resolution of an issue arising from a change in controlling law occurring after the agency action. Ind.Code § 4-21.5-5-10.
[10] The information in the brackets is provided by Indiana Code Section 4-21.5-3-29, to which 4-21.5-3-27(a) refers.
[11] DSA cites three cases in support of its argument, none of which are persuasive. All the cases apply collateral estoppel to agency decisions in which both parties had a fair opportunity to "litigate an issue," thereby recognizing that the process supporting the agency decision be adjudicatory, judicial, or quasi-judicial in nature. See Ill. Health Maint. Org. Guar. Ass'n v. Dep't of Ins., 372 Ill.App.3d 24, 309 Ill.Dec. 557, 864 N.E.2d 798, 809-10 (2007) ("In Illinois, administrative decisions have collateral estoppel effect where a department's determination is made in proceedings that are adjudicatory, judicial, or quasi-judicial in nature."); Barber v. Weber, 292 Wis.2d 426, 715 N.W.2d 683, 687 (2006) ("An unreviewed agency determination may have preclusive effect if the dispute was properly before the agency and the parties had an adequate opportunity to litigate."); and Bowen v. U.S., 570 F.2d 1311, 1322 (7th Cir.1978) ("[T]he underlying policy, viz., that one fair opportunity to litigate an issue is enough, is best served by rule that issue preclusion applies to a final administrative determination of an issue properly before an agency acting in a judicial capacity when both parties were aware of possible significance of issue in later proceedings and were afforded a fair opportunity to litigate issue and to obtain judicial review.").
[12] As previously mentioned, it is the ALI's order that is the subject of review.
[13] The current version and the 2007 version of 405 IAC 1-12-12(a) are the same.
[14] The 2009 version of 405 IAC 1-12-16(a) version reads:

(a) The basis used in computing the capital return factor and the average historical cost of property of the median bed shall be the historical cost of all assets used to deliver patient or resident-related services, provided they are:
(1) in use;
(2) identifiable to patient or resident care;
(3) available for physical inspection; and
(4) recorded in provider records.
405 IAC 1-12-16(c) has also been modified as follows: "Assets used in computing the capital return factor and the average historical cost of property of the median bed shall include only items currently used in providing services customarily provided to patients or residents."
[15] Citing 405 IAC 1-12-3(a), DSA asserts that all accounting under the regulations must comply with GAAP. That rule reads:

The basis of accounting used under this rule is a comprehensive basis of accounting other than generally accepted accounting principles. However, generally accepted accounting principles shall be followed in the preparation and presentation of all financial reports and all reports detailing proposed change of provider status transactions, unless otherwise prescribed by this rule.
Id. Thus, GAAP are not used to determine how to calculate the CRF, but are used for the preparation of financial reports.
[16] To the extent that intangible assets could be considered, 405 IAC 1-12-16(a) limits such assets to those "identifiable to patient or resident care." The intangible assets that DSA sought to include consisted of operating licenses and certifications, employment and service and other vendor contracts, software licenses, databases, copyrights, and trade names. DSA has not shown that these are related to facilities, land, and equipment, or that they are used for patient care.
[17] Specifically, Deborah D. Freeland, a partner with Clifton Gunderson, testified as its designated representative.
[18] DSA does not argue that it could have produced the necessary documentation.
[19] Scheid discusses exceptions to the general rule that are not relevant here. Note also that "if a petitioner does not address the post hoc nature of the State Board's argument in its brief, any complaints along those lines are waived, and the Court will decide the issue on the merits." Miller Structures, Inc. v. State Bd. of Tax Comm'rs, 748 N.E.2d 943, 951 n. 5 (Ind. Tax Ct.2001).
[20] Many states also recognize the post hoc rationalization rule. See e.g., Bereano v. State Ethics Comm'n, 403 Md. 716, 944 A.2d 538, 554 (2008); Lewis Family Farm, Inc. v. Adirondack Park Agency, 22 Misc.3d 568, 868 N.Y.S.2d 481, 487 (N.Y.Supp.2008); Webb v. W. Va. Bd. of Medicine, 212 W.Va. 149, 569 S.E.2d 225, 234 (2002); Boyd v. People, Inc., 43 Va.App. 82, 596 S.E.2d 100, 108 (2004); Stone Landing Corp. v. Bd. of App. of Vill. of Amityville, 5 A.D.3d 496, 773 N.Y.S.2d 103, 106 (2004); So. Cal. Edison Co. v. Pub. Util. Comm'n, 85 Cal.App.4th 1086, 102 Cal. Rptr.2d 684, 702 (2000); Children's Defense Fund v. D.C. Dep't of Employment, 726 A.2d 1242, 1248 n. 5 (D.C.1999).
[21] A third case cited by DSA, Building Industry Ass'n of Superior California v. Babbitt, 1999 WL 33326722 (D.D.C.1999), is an unreported case. In Triplett v. USX Corp., 893 N.E.2d 1107 (Ind.Ct.App.2008), trans. denied (2009), we stated,

While not binding on Indiana courts, we observe that the Federal Rules of Appellate Procedure permit citation to unpublished opinions issued after January 1, 2007. FRAP 32.1(a). As to unpublished opinions issued before January 1, 2007, Rule 32.1(a) provides that citation to such opinions is governed by the local rules.
The District of Columbia Circuit Court's local rule 32.1(a) echoes the federal rule, thus implying that citations to unpublished opinions issued prior to January 1, 2007, are prohibited. The decision cited by DSA was issued in 1999. As such, we will not consider it.