# FOR PUBLICATION

ATTORNEYS FOR APPELLANT:

**WADE D. FULFORD**
Indiana Department of Insurance
Indianapolis, Indiana

**GREGORY F. HAHN**
**BRYAN H. BABB**
**KEVIN M. QUINN**
**JOEL T. NAGLE**
Bose McKinney & Evans, LLP
Indianapolis, Indiana

ATTORNEYS FOR AMICUS CURIAE:

**KARL L. MULVANEY**
**MARGARET M. CHRISTENSEN**
Bingham Greenebaum Doll LLP
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**JAN M. CARROLL**
**SEAN P. BURKE**
Barnes & Thornburg LLP
Indianapolis, Indiana

**TODD L. PADNOS**
**DANIELLE T. KENNEDY**
Sheppard Mullin Richter & Hampton, LLP
San Francisco, California

FILED

CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| STEPHEN W. ROBERTSON, INSURANCE COMMISSIONER OF THE STATE OF INDIANA, in his official capacity only and not in his individual capacity, on behalf of the INDIANA DEPARTMENT OF INSURANCE, | ) ) ) ) ) ) | |
| Appellant-Respondent, | ) ) | No. 49A02-1110-PL-971 |
| vs. | ) ) | |
| TICOR TITLE INSURANCE COMPANY OF FLORIDA, now known as Chicago Title Insurance Company, successor by merger | ) ) ) ) | |
| Appellee-Petitioner. | ) ) | |

**December 19, 2012**

**OPINION – FOR PUBLICATION**

**MATHIAS, Judge**

The Insurance Commissioner of the State of Indiana initiated administrative proceedings against Ticor Title Insurance Company of Florida ("Ticor") after an investigation revealed that Ticor was charging potentially excessive and discriminatory title insurance rates to its Indiana customers. A hearing was held and a hearing officer for the Indiana Department of Insurance ("the IDOI") determined that Ticor's title insurance rates were excessive and discriminatory. The hearing officer issued an order directing Ticor to, in part, refund excessive premiums, establish an internal control process to ensure that the appropriate premium is charged to Ticor's customers, and pay unpaid premium taxes. Ticor subsequently filed a Petition for Judicial Review of Administrative Order in Marion Superior Court. After a hearing was held on the petition, the trial court issued findings of fact and conclusions of law reversing the administrative order. The IDOI appeals and raises the following issues:

> I. Whether the trial court failed to appropriately defer to the IDOI's interpretation of the Rate Statute when the court accepted Ticor's interpretation of that statute in issuing its findings of fact and conclusions of law and,

> II. Whether the trial court erred when it reversed the administrative order because the administrative hearing officer's findings of fact and conclusions of law are supported by substantial evidence.

Concluding that the IDOI's interpretation of the Rate Statute was reasonable and that the administrative hearing officer's findings of fact are supported by substantial evidence, we reverse and remand for proceedings consistent with this opinion.

**Facts and Procedural History**

Ticor is licensed to write title insurance in Indiana. Ticor operates in Indiana solely through twenty-six independent non-affiliated agencies. These independent insurance agents have been appointed by Ticor pursuant to written agency agreements for the purpose of preparing and issuing Ticor's title insurance policies.

The Indiana Department of Insurance, which is authorized by statute to regulate the practice of title insurance in Indiana, commenced a target market examination of Ticor on April 25, 2008. The examination investigated Ticor's title insurance transactions for the 2007 calendar year. IDOI appointed Noble Consulting Services ("Noble") as the examiner.

After interviewing Ticor's representatives and its appointed insurance agents and reviewing Ticor's agency contracts authorizing certain title insurance agents to sell its products, premium remittance reports, financial statements and HUD-1 settlement statements, Noble prepared a target market conduct examination report. The report was submitted to the IDOI Commissioner on November 12, 2008. In the report, Noble alleged that Ticor 1) lacked proper governance and oversight over its duly appointed insurance agents, 2) the agents charged premium rates higher than Ticor's contractual rates, 3) Ticor's internal controls did not ensure that the agents charged rates in accordance with Ticor's contractual rates, 4) Ticor did not audit its independent agents to

3

determine the accuracy of the premium remittances, 5) Ticor's internal control program failed to identify premium remittance as a key risk area, 6) the internal control program failed to verify the accuracy of the premium remittance, which creates a risk that Ticor underpays premium tax, 7) Ticor failed to audit its independent agent's compliance with the Real Estate Settlement Procedures Act ("RESPA"), 8) the agents violated Indiana law by charging inconsistent premium rates, and 9) Ticor's internal controls should ensure that its agents charge consistent premium rates.

Noble's report concentrated on the business practices of three agencies operating under limited agency agreements with Ticor: HomeQuest Title, LLC, Title Source, Inc., and Data Search, Inc. Noble concentrated on these agencies because they account for nearly 70% of the title insurance premiums written for Ticor in Indiana in 2007. The agency agreement between Ticor and all insurance agencies specify that agents should charge and collect premiums in accordance with Ticor's rate book. The rates in the rate book apply only to insurance premium rates and do not include other settlement services.

Noble concluded that the three agencies charged premium rates that were higher than those listed in the rate book. Specifically, 401 of 504 closings performed by HomeQuest resulted in premiums higher than the Ticor rate book, 719 of Title Source's 1009 closings resulted in premiums exceeding the Ticor rate, and 307 of 590 closings performed by Data Search resulted in excessive premiums. Noble concluded that in the aggregate, the three agencies charged $116,000 more in title insurance premiums than they were authorized to charge under Ticor's rate book. Noble also concluded that the three agencies were allowed to utilize separate rate books to calculate title insurance

4

premiums; therefore, Indiana consumers purchasing the same amount of title insurance from Ticor agents paid different premium rates. Noble also concluded that the agents routinely violated RESPA by failing to itemize the settlement charges on the HUD statements.

In concluding its report, Noble recommended that Ticor implement internal controls and perform periodic audits to insure the accuracy of the premiums charged to consumers. Noble also recommended that Ticor audit its Indiana agents for compliance with RESPA. Finally, Noble urged Ticor to ensure that the agents charge consumers the contractual premium rate on a consistent basis.

On July 22, 2009, Ticor submitted to the IDOI its written objection to Noble's report. Shortly thereafter, the Commissioner of the IDOI issued an Order Regarding the Market Conduct Examination Report and Rebuttal wherein the Commissioner "concluded that [Ticor] has potentially violated several provisions of the Indiana Code: (i) violations of Indiana Code §§ 27-4-1 et seq. related to excessive and unfairly discriminatory insurance premium rates charged to consumers and (ii) the failure to properly account for and pay premium tax in accordance with Ind. Code § 27-1-18-2." Appellant's App. pp. 135-36. A two-day evidentiary hearing was then held over the violations described in Noble's report.

On September 3, 2010, the hearing officer issued an Administrative Order, in which the officer concluded that for the purposes of ensuring RESPA compliance and performing title searches, the investigated agencies were not agents of Ticor. But the hearing officer found that Ticor and its independent agents do have an agency

5

relationship for the purpose of charging premium rates, collecting premiums and the payment of premium taxes. The officer further concluded that Ticor allowed its agents to charge premiums in excess of its rate schedule and charge different premium rates to consumers that are of the same class and involve the same risk. The hearing officer also found that Ticor "does not have an adequate internal control environment" and was therefore complicit in HomeQuest's "failure to charge consistent premiums to Indiana consumers in the same class for equivalent policies." Id. at 100-01. Finally, the officer concluded that Ticor failed to pay premium tax on scheduled premiums and failed to identify premiums collected by its agents.

As a result of its findings, the hearing officer ordered Ticor to refund all proceeds from title insurance policies issued in 2007, "which charged premium amounts exceeding the rate in [Ticor's] rate book to the individual Indiana consumer that was overcharged." Id. at 101-02. In addition, Ticor was ordered to require its agents to charge its scheduled rate for title insurance premiums for property located in Indiana. Ticor was also fined $50,000 for its "failure to exert proper internal controls and auditing devices to insure that its contracted independent producer, HomeQuest did not charge inconsistent and excessive premium rates[.]" Id. at 103. Finally, Ticor was ordered to pay 1.3% of $116,000, the unreported premium taxes, with interest and a $10,000 penalty.

On October 4, 2010, Ticor filed its Verified Petition for Judicial Review of the Administrative Order, and requested a stay against the enforcement of that order. The trial court stayed enforcement of the administrative order and held argument on Ticor's petition on July 21, 2011.

On September 30, 2011, the trial court issued its findings of fact and conclusions of law vacating the IDOI's administrative order and remanding for further proceedings. In doing so, the trial court found in pertinent part:

30. Non-Affiliated Operations, however, are fundamentally different. Title insurers or their affiliated groups do not own or operate Non-Affiliated Operations. Rather, Non-Affiliated Operations are independent operations that are appointed by the title insurer, pursuant to limited authority agency agreements, for the sole purpose of issuing title insurance commitments, policies and endorsements.

31. Thus, the title professionals of Non-Affiliated Operations act in a manifold capacity: (i) they act on behalf of the title insurer when issuing the title insurer's commitments, policies and endorsements, and (ii) they act on behalf of themselves or other parties, such as lenders, when providing other goods and services, such as Settlement Services, to their own customers.

32. Consequently, the title professionals of Non-Affiliated Operations (i) are compensated by title insurers through commissions for the issuance of the title insurer's commitments, policies and endorsements. and (ii) charge the consumer independently ("Settlement Charges") for their Settlement Services.

\*\*\*

35. The independent title professionals of these twenty-six Non-Affiliated Operations are not employees of Ticor. Rather, they are independent persons and entities who have been appointed by Ticor pursuant to written agency agreements for the limited purpose[] of preparing and issuing Ticor's title insurance policies.

36. The written agency agreement by which Ticor contracted with HomeQuest ("the Agency Contract") was the only agency agreement submitted into evidence at the Administrative Hearing.

37. The Agency Contract limits the authority of the independent, Non-Affiliated Operation to act on behalf of Ticor solely for the purpose of issuing Ticor's title insurance commitments, policies and endorsements.

38. Indeed, the Agency Contract provides, in relevant part, as follows:

1. Appointment of an Agent. Principal appoints Agent as a Policy Issuing Agent of Principal for the purpose of issuing title insurance commitments, policies and endorsements in the Counties and State(s) set forth in Terms of Policy Issuing Agency Contract. Agent may validate, countersign, issue and deliver commitments, policies and endorsements of Principal on forms supplied by Principal in the matter provided by this agreement and the rules, regulations and instructions of the Principal as shall from time to

7

time be furnished to Agent. Principal and Agent agree that business under this Contract shall be conducted in accordance with the laws and regulations of the state(s) set forth in Terms of Policy Issuing Agency Contract and the United States of America.

The Agency Contract does not specify that Ticor's independent, Non-Affiliated Operations are authorized to offer any goods or services on behalf of Ticor other than Ticor's title insurance commitments, policies and endorsements, nor any Settlement charges on behalf of Ticor.

39. Consequently, in addition to selling Ticor's title insurance commitments, policies and endorsements, Ticor's independent, Non-Affiliated Operations provide Settlement Services, on their own behalf, to their own customers.

40. Ticor does not control how its independent, Non-Affiliated Operations perform Settlement Services requested by the Non-Affiliated Operation's customers, nor does Ticor receive any portion of the fees paid by consumers to Non-Affiliated Operations for such Settlement Services. Rather, the Non-Affiliated Operations customarily abide by closing instructions provided by the mortgage lender when performing these Settlement Services.

41. Further, Ticor's Non-Affiliated Operations are not prohibited by Ticor from contracting with any other title insurer. Indeed, the Agency Contract specifically contemplates that the Non-Affiliated Operation may contract with other title insurers to sell their products.

\*\*\*

51. The Agency Contract specifies that the premiums that HomeQuest may charge its customer for a Ticor title insurance commitment, policy or endorsement must comply with Ticor's rate book (the "Rate Book").

52. The rates set forth in the Rate Book pertain only to insurance premium rates and do not include other services, i.e., they are only reflective of the "risk rates" and do not include Settlement Services performed by the Non-Affiliated Operation. The Rate Book does not govern HomeQuest's independent charges for Settlement Services and states in relevant part:

> The rates quoted in this rate book are for title insurance risk premium only and do not include charges for title searches or examinations, abstracts, attorneys fees, escrow or closing services, inspections, or other services provided by attorneys, lenders, surveyors, abstractors, or other venders of real estate services.

53. Independent title professionals commonly charge their own customers for a variety of Settlement Services associated with the independent title professionals' provision of escrow and closing services – which are purchased from the independent title professionals separate from the premium for the title insurance policy itself.

8

54. Settlement Services and expenses are paid to and retained by the independent title professional.

***

58. The HUD-1 closing statement records prepared by Data Search and Title Source separated the total charge into premium and Settlement Charges. However, the HUD-1 closing statement records prepared by HomeQuest show it charged its customers a "bundled" rate, in that HomeQuest (i) charged a single amount comprised of a premium charge for the title insurance policy and a charge for Settlement Services, and (ii) failed to distinguish among these two charges when completing line 1108 of the HUD-1 settlement statement. Accordingly, Noble sought to determine the portion of the total bundled charge attributed to insurance premiums.

59. In order to make this premium determination, Noble considered two testing methodologies set forth in a document prepared by Noble titled the "Noble Consulting Meeting with HomeQuest, July 16, 2008" (hereafter, the "Noble Testing Memo").

60. Under the first methodology in the Noble Testing Memo, labeled View 1, Noble subtracted from the amount shown on line 1108 the amount that it believed HomeQuest charged for the non-insurance portion of the bundled charge and then treated the balance as the title insurance premium.

61. Under the second methodology in the Noble Testing Memo, labeled View 2, Noble subtracted from the amount shown on line 1108 the amount set forth in the Rate Book as premium and then treated the balance as the non-title insurance charges.

62. The View 1 methodology calculated insurance premiums that differ from Ticor's actual premiums. In contrast, the View 2 methodology calculated the correct insurance premium.

63. Noble used View 1 for its testing methodology.

64. By using View 1 as the methodology to determine the premiums charged by HomeQuest, Noble was unable to determine the actual title insurance premium, or compare it to Ticor's Rate Book.

***

69. If Noble had instead utilized the View 2 methodology, it would have found that the independent, Non-Affiliated Operations had charged the correct insurance premium under Ticor's Rate Book, plus a widely variable charge for Settlement Services.

***

76. . . . [T]here is no evidence in the Record of the costs incurred by Ticor and its independent title professionals for selling, preparing, issuing and servicing Ticor's title insurance commitments, policies and endorsements. Similarly, there is no evidence in the Record as to whether the premium revenue collected by or on behalf of Ticor was sufficient to cover Ticor's

9

costs, let alone provide Ticor with a profit, or for that matter, whether any such profit was fair and reasonable.

***

80. . . . [T]here is no evidence in the Record as to the costs incurred by Ticor and its independent title professionals for selling, preparing, issuing and servicing Ticor's title insurance commitments, policies and endorsements. Similarly, there is no evidence in the Record as to whether the premium differential was based upon a differential in costs for issuing the policy with the higher premium.

***

82. . . . Noble offered no evidence other than its conclusion that the alleged premiums were excessive and unfairly discriminatory.

Appellant's App. pp. 12-22 (record citations omitted).

The trial court then examined the Title Insurance Rate Statute codified at Indiana Code section 27-4-1-4, which prohibits excessive or inadequate charges for policy premiums and unfair discrimination between persons of the same class involving equivalent hazards. The trial court determined the terms used in the Rate Statute are technical terms of art and reached the following conclusions:

29. This Court concludes that the Statutory Rate Standard is primarily a cost-based standard, requiring an analysis of an insurer's costs as the central determination regarding whether the premium or rate charged for the insurer's product is excessive or unfairly discriminatory.
30. "Excessive" under the Rate Statute should mean, at least in part, that the premium charged by an insurer is not an actuarially sound estimate of the expected value of all future costs associated with an individual risk transfer.
31. Thus, whether a premium or rate is excessive cannot be conclusively determined without at least identifying and examining the costs associated with the sale, preparation, issuance and service of the title insurance commitment, policy or endorsement issued to the customer.
32. "Unfairly discriminatory" under the Rate Statute should mean, at least in part, that there exists rate differences that are inconsistent with differences in the underlying costs.
33. Thus, whether a rate charged by one independent Non-Affiliated Operation is unfairly discriminatory cannot be determined simply by comparing it to another rate charged by a second independent, Non-Affiliated Operation for a similar amount of title insurance coverage; rather,

10

the costs incurred by the two agents in providing the coverage must be examined. Similarly, whether a rate charged by a single independent, Non-Affiliated Operation is unfairly discriminatory cannot be determined simply by comparing the rates the independent, Non-Affiliated Operation charges its customers for similar levels of coverage.

34. Therefore, even if there exist material differences among the rates in the Rate Book utilized by HomeQuest and in the rate schedules utilized by Data Search and Title Search, it simply cannot be determined whether any of these rates is unfairly discriminatory without an analysis of the agents' underlying costs in issuing such title insurance products. Further, the differences amoung the rates charged by the three Non-Affiliated Operations and the materiality of such differences were never examined at the Administrative Hearing or shown as any basis of the administrative order.

36. This Court concludes that, by applying an arbitrary ratemaking standard, the Department's Hearing Officer erred as a matter of law when it found that Ticor charged premiums or rates that are excessive.

37. This Court further concludes that, by applying an arbitrary ratemaking standard, the Department's Hearing Officer erred as a matter of law when it found that Ticor charged premiums or rates that are unfairly discriminatory.

Id. at 30-31.

The trial court also concluded that the Hearing Officer properly found that Ticor was not responsible for the independent title professionals' compliance with RESPA, but that the Hearing Officer erred when it concluded that Ticor failed to properly monitor its Non-Affiliated Operations' compliance with RESPA. The court also concluded that the Hearing Officer erred when it included settlement charges in its calculation of Ticor's premium tax obligation, and therefore IDOI erred when it ordered Ticor to pay an additional $2,015.37 in premium taxes and interest.

The trial court therefore entered judgment in favor of Ticor and set the administrative order aside. The court ordered the IDOI to refund Ticor's premium tax

11

and interest payment and remanded the case for further proceedings consistent with its judgment. The IDOI now appeals.

**Standard of Review**

The General Assembly has granted courts the power to review the action of state government agencies taken pursuant to the Administrative Orders and Procedures Act "(AOPA)", but the power of judicial review is limited. LTV Steel Co. v. Griffin, 730 N.E.2d 1251, 1257 (Ind. 2000). A court may only set aside agency action that is: (1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) contrary to constitutional right, power, privilege, or immunity; (3) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; (4) without observance of procedure required by law; or (5) unsupported by substantial evidence. Ind. Code § 4-21.5-5-14(d).

The burden of demonstrating the invalidity of an agency action is on the party asserting its invalidity. I.C. § 4–21.5–5–14(a). An agency acts arbitrarily or capriciously if its action constitutes a willful or unreasonable action without consideration and in disregard of the facts and circumstances of the case or without some basis that would lead a reasonable person to such action. Ind. State Bd. of Educ. v. Brownsburg Comm. Sch. Corp., 865 N.E.2d 660, 665 (Ind. Ct. App. 2007). Trial and appellate courts that review administrative determinations are prohibited from reweighing the evidence or judging the credibility of witnesses and must accept the facts as found by the administrative body. Id. at 665–66. Our court affords deference to the administrative agency's findings of fact,

12

but no such deference is accorded to the agency's conclusions of law.  LTV Steel, 730 N.E.2d at 1257.

**Discussion and Decision**

The Commissioner of the IDOI has been granted broad powers by the General Assembly.  Pertinent to the issues presented in this appeal, the Commissioner is empowered to investigate insurance companies, issue orders detailing any irregularities revealed by the investigation, and order curative action as he deems necessary.  See I.C. ch. 27-1-3.1.  Specifically, "[u]pon determining that an examination should be conducted, the commissioner or the commissioner's designee shall issue an examination warrant appointing one (1) or more examiners to perform the examination and instructing them as to the scope of the examination."  I.C. § 27-1-3.1-9.  The commissioner, or the commissioner's examiner, is then required to prepare a report and provide the subject insurance company with an opportunity to respond.  I.C. § 27-1-3.1-10.  After reviewing the examination report and any rebuttal by the subject insurance company, the commissioner may adopt the report, reject the report for the purpose of reopening the examination, or set the matter for an investigatory hearing.  I.C. § 27-1-3.1-11.  "If the examination report reveals that the company is operating in violation of any law, regulation, or prior order of the commissioner, the commissioner may order the company to take any action the commissioner considers necessary and appropriate to cure that violation."  Id.

13

**I. Interpreting Indiana Code section 27-4-1-4(a)(7)(C)(i) ("the Rate Statute")**

The administrative hearing officer for IDOI and the trial court applied differing interpretations of the Rate Statute in this case.

> An interpretation of a statute by an administrative agency charged with the duty of enforcing the statute is entitled to great weight, unless this interpretation would be inconsistent with the statute itself. . . . Deference to an agency's interpretation of a statute becomes a consideration when a statute is ambiguous and susceptible of more than one reasonable interpretation. When a court is faced with two reasonable interpretations of a statute, one of which is supplied by an administrative agency charged with enforcing the statute, the court should defer to the agency. If a court determines that an agency's interpretation is reasonable, it should terminate its analysis and not address the reasonableness of the other party's proposed interpretation. Terminating the analysis recognizes the general policies of acknowledging the expertise of agencies empowered to interpret and enforce statutes and increasing public reliance on agency interpretations. However, an agency's incorrect interpretation of a statute is entitled to no weight. If an agency misconstrues a statute, there is no reasonable basis for the agency's ultimate action and the trial court is required to reverse the agency's action as being arbitrary and capricious.

Dev. Servs. Alts., Inc. v. Ind. Family & Social Servs. Admin., 915 N.E.2d 169, 181 (Ind. Ct. App. 2009), trans. denied (quoting Pierce v. State Dep't of Correction, 885 N.E.2d 77, 89 (Ind. Ct. App. 2008)) (citations and quotation marks omitted).

> The Rate Statute provides in pertinent part:

> The following are hereby defined as unfair methods of competition and unfair and deceptive acts and practices in the business of insurance: . . . Making or permitting any of the following: . . . Excessive or inadequate charges for premiums, policy fees, assessments, or rates, or making or permitting any unfair discrimination between persons of the same class involving essentially the same hazards, in the amount of premiums, policy fees, assessments, or rates charged or made for . . . policies or contracts of reinsurance or joint reinsurance, or abstract and title insurance[.]

I.C. § 27-4-1-4(a)(7)(C)(i).

The IDOI argues that the Rate Statute is unambiguous and the "focal point of the [statute] is on the premium the insurer charges the insured." Appellant's Br. at 37. Under the IDOI's interpretation, the Rate Statute simply prohibits unfair discrimination between persons of the same class involving essentially the same hazards. In other words, insurers should be charging comparable insurance premiums to insureds purchasing the same amount of title insurance.

Ticor's operating procedures support the IDOI's interpretation of the Rate Statute. Ticor provided its independent insurance agents with Ticor's Rate Book. The contractual agreements between Ticor and its agents provided that the agents were required to quote, charge, and collect premium rates in accordance with Ticor's Rate Book. The title insurance premium rates listed in the Rate Book did not include rates for other settlement services.

IDOI's investigation revealed that Ticor's agents charged rates that exceeded the rates listed in Ticor's Rate Book. Ticor acknowledged that its agents should have been charging its Indiana customers the same premium rates for the same amount of title insurance coverage. Appellant's App. pp. 572-73. Ticor's own policy is therefore consistent with the IDOI's interpretation of the Rate Statute.

We further observe that IDOI's interpretation of the Rate Statute is consistent with the National Association of Insurance Commissioners's ("NAIC") standards, procedures, and criteria for conducting market conduct examinations of title insurance companies and agents. In states, such as Indiana, where premium rates are not required to be filed with an applicable regulatory agency, the NAIC recommends that

15

it is prudent to determine if rates are being applied consistently and in accordance with the title insurance company's own rating methods. In general, rates should not be unfairly discriminatory. Wide-scale application of incorrect rates by a title insurance company may raise financial solvency questions or be indicative of inadequate management oversight. Deviation from established rating plans may also indicate that a title insurance company is engaged in unfair competitive practices. Inconsistent application of rates, individual risk premium modifications, modification factors and deviations can result in unfair discrimination.

NAIC Market Regulation Handbook, Ch. 18, p. 346 (2011). Our General Assembly has explicitly directed that when the IDOI conducts examinations, the commissioner shall "consider such matters as the results of financial statement analyses and ratios, changes in management or ownership, actuarial opinions, reports of independent certified public accountants, and other criteria as set forth in the NAIC examiner's handbook." Ind. Code § 27-1-3.1-8.

For all of these reasons, we conclude that IDOI's interpretation is reasonable, and consequently, we terminate our analysis and do not address the reasonableness of Ticor's proposed interpretation. See Dev. Servs. Alts., Inc., 915 N.E.2d at 181.

## II. Ticor's Actual and/or Apparent Authority over its Agents

We now turn our attention to the issue of whether Ticor had sufficient control over its agents to support a finding of actual or apparent authority. The administrative hearing officer concluded that "[f]or the purposes of charging premium rates, collecting premiums, and payment of premium taxes," Ticor had both actual and apparent authority over its title insurance agents.[1] Appellant's App. pp. 97-98.

---

[1] However, the administrative hearing officer also concluded that "for the purposes of ensuring RESPA compliance and performing title searches, examinations, and other settlements services," the title insurance agents were not agents of Ticor. Appellant's App. p. 97.

16

"'Agency is a relationship resulting from the manifestation of consent by one party to another that the latter will act as an agent for the former.'" Meridian Sec. Ins. Co. v. Hoffman Adjustment Co., 933 N.E.2d 7, 12 (Ind. Ct. App. 2010) (quoting Smith v. Brown, 778 N.E.2d 490, 495 (Ind. Ct. App. 2002)), trans. denied. To establish an actual agency relationship, three elements must be shown: (1) manifestation of consent by the principal, (2) acceptance of authority by the agent, and (3) control exerted by the principal over the agent. Douglas v. Monroe, 743 N.E.2d 1181, 1186 (Ind. Ct. App. 2001). Whether an agency relationship exists is generally a question of fact. Id. at 1187.

We also observe that, in general, an insurance agent or broker who undertakes to procure insurance for another is an agent of the proposed insured. Anderson Mattress Co. v. First State Ins. Co., 617 N.E.2d 932, 939 (Ind. Ct. App. 1993), trans. denied. However, "an insurance broker becomes the agent of the insurer when an insurance policy is issued." Malone v. Basey, 770 N.E.2d 846, 851 (Ind. Ct. App. 2002). "'In Indiana when a broker makes [an] application for insurance and the insurance policy is issued, the broker is the agent of the insurer and can bind it within the scope of his authority.'" Id. (quoting Aetna Ins. Co. of the Midwest v. Rodriguez, 517 N.E.2d 386, 388 (Ind. 1988)).

Ticor and the IDOI agree that Ticor and its title agents contractually agreed that the agents were authorized to sell Ticor's title insurance products and perform specific functions related to selling Ticor's insurance policies. For example, title insurance agent HomeQuest was appointed to issue Ticor's title insurance commitments, policies and endorsements, and was therefore authorized to "validate, countersign, issue and deliver commitments, policies and endorsements" as provided for in their agreement. The title

17

insurance agents were also required to charge the premiums listed in Ticor's Rate Book. Appellant's App. pp. 1103-04. The parties agree that for the purpose of selling and issuing Ticor's title insurance policies, Ticor had actual authority over its agents by virtue of the parties' written contract.

However, there is no language in the agreement between Ticor and its agents or any other evidence in the record that would lead us to conclude that Ticor had actual or apparent authority over its title agents with regard to other closing and escrow services the independent agents performed for their clients. See e.g. Fidelity Nat. Title Ins. Co. v. Mussman, 930 N.E.2d 1160 (Ind. Ct. App. 2010).

### III. Sufficient Evidence of Excessive Premium Rates

Finally, we consider whether the trial court exceeded its authority when it concluded that Noble Consulting's testing method for determining HomeQuest's premium rates was flawed. Arguing that the trial court inappropriately reweighed the evidence and the credibility of the witnesses, the IDOI contends the determination of the administrative law judge that Ticor charged excessive and unfairly discriminatory premium rates is supported by the evidence.

Importantly to the case before us, Ticor's Vice President testified that Indiana consumers should have been charged the same premium rate for the same amount of title insurance coverage. Appellant's App. pp. 572-73. Moreover, as the principal, Ticor had a duty to ensure that its agents were charging and collecting the correct premium rate for its title insurance products.

18

In its investigation of Ticor, Noble concluded that Ticor "would accept whatever amount was reported or remitted by the agent as the actual premium. So that's how they determined actual premium as what was remitted, not what was charged." Appellant's App. p. 445. Ticor had auditing controls in place that would reject premiums if the premium differed from its rate schedule, but premiums remitted by Indiana consumers were not analyzed under that control system. In other words, Ticor failed to determine whether the contract premiums paid by Indiana consumers were the same premium amounts remitted to Ticor by its agents. Id.

Noble determined that Title Source and Date Search overcharged its customers a net amount of $6957.55 spread over 1009 title transactions, and a net amount of $6497.70 spread over 590 transactions, respectively. Noble did not consider those overcharges to be material amounts.[2] Id. at 469. And the total premium charged to the consumer was remitted to Ticor. Id. at 446.

However, HomeQuest significantly overcharged its customers, and the agent told Noble that title insurance rates were discretionary and subject to change as market conditions change. Id. at 842. The parties agree that HomeQuest remitted the correct premium amount to Ticor using Ticor's rate schedule.[3] Id. at 775. But the premium amount HomeQuest charged to the consumer often exceeded the premium that should have been charged according to the rate schedule. As HomeQuest's principal, Ticor was

_____

[2] Title Source's and Data Search's errors primarily resulted from their use of outdated title insurance premium rate schedules. Appellant's App. p. 857.

[3] Ticor's agreement with its agents provided that the agent would retain a portion of the premium as the agent's commission and remit the remainder to Ticor. Appellant's App. p. 638.

19

responsible for failing to determine that its agent was charging excessive rates to its customers.

On its customers' HUD statements, HomeQuest bundled its insurance premium rates with the title search fee and the title examination fee. Home Quest dictated the amount charged for the title search and title examination fees, and retained the entirety of those fees. Ticor's own expert, actuarial consultant Michael Miller, opined that HomeQuest did not charge premiums in excess of Ticor's rate schedule; rather, what appears to be an excessive premium charge was actually an amount charged for the agent's title search and examination fees. The administrative hearing officer considered and ostensibly rejected expert Miller's conclusion in this regard.[4] See e.g. id at 776.

Randy Lamberjack, Noble's founder and examiner-in-charge of the investigation, testified that HomeQuest's title insurance agent, Rhonda Manworren, was questioned about the bundled fees. Id. at 433. Using the information provided by Manworren, Noble calculated the title insurance premium charged to the consumer to the best of its ability. Manworren remitted the correct premium amount to Ticor, but retained the remaining portion of the overcharged premium. Id. at 434.

Noble also discovered that consumers closing on similar loan amounts were charged completely different premiums. In total, HomeQuest overcharged its title insurance customers a net amount of approximately $86,000 in 2007.[5] Id. at 446.

---

[4] In his testimony and analysis, Miller considered the term "excess" or "excessive" as an actuarial term of art, and his interpretation of that term and his testimony were consistent with the trial court's erroneous interpretation of the Rate Statute.

[5] HomeQuest overcharged its customers a gross amount of $95,783, but Noble reduced that amount because certain consumers were undercharged. Appellant's App. p. 447.

Manworren admitted that she charged the consumer whatever she felt the market would bear. Id. at 462. HomeQuest failed to charge the correct premium according to Ticor's Rate Schedule on approximately eighty percent of its closings. Id. at 446. Because Manworren incorrectly bundled premiums and fees on line 1108 on the HUD form, Lamberjack testified that its calculation of the overcharge amount could possibly include amounts HomeQuest charged for other fees, but also stated:

> We tried to give credit for the additional fees, if there was not additional fees above to compare. But because there's no pattern, we're comfortable that that was just over-reported on line 1108 as premium.

Id. at 447; see also Appellant's App. p. 463 (explaining Noble's attempt to calculate the premium charged by HomeQuest and noting that in many instances Noble was able to determine what HomeQuest charged its customers for certain fees). Noble's ultimate conclusion was that to obtain more money from its customers, HomeQuest would increase the amount of the title insurance premium owed. Id. at 464.

Moreover, Noble's report and Lamberjack's accompanying testimony support the administrative hearing officer's finding that

> A. On title insurance policies covering $0-$49,999 in liability, Home Quest's average rate per $1000 ranged from $2.50 to $17.48.
> B. On title insurance policies covering $50,000-$99,999 in liability, HomeQuest's average rate per $1000 ranged from $1.54 to $10.38.
> C. On title insurance policies covering $100,000 to $500,000 in liability, HomeQuest's average rate per [$]1000 ranged from $1.07 to $17.48.

Appellant's App. p. 84 (record citations omitted). The record is replete with evidence establishing that Ticor had no procedures in place to ensure that its agents were quoting, charging, and collecting title insurance premiums as set forth in Ticor's rate book. The

21

record is also clear that the agreement between Ticor and its agents stipulated that the agent would collect the premium rates established by Ticor. Id. at 91.

We therefore conclude that substantial evidence supports the administrative hearing officer's conclusions that 1) Ticor violated the Rate Statute, Indiana Code section 27-4-1-4(a)(7)(C)(i), prohibiting excessive rates and unfair discrimination when it permitted its agents "to charge Indiana consumers more than the company's rate schedule, resulting in excessive fees without the Indiana consumers' knowledge or consent[;]" and 2) that Ticor violated the Rate Statute by allowing its agents "to charge different premium rates to Indiana consumers that are of the same class and involve the same risk." Id. at 100.

**Conclusion**

We conclude that the trial court exceeded its authority when it reweighed the evidence presented to the administrative hearing officer. Because there is substantial evidence to support the administrative hearing officer's findings that Ticor allowed its agents to charge excessive and discriminatory rates to its Indiana customers, we reverse the trial court's decision to set aside the Indiana Commissioner of Insurance's September 3, 2010 order, and we reinstate the administrative order.

Reversed and remanded for proceedings consistent with this opinion.

VAIDIK, J., and BARNES, J., concur.

22