

**FILED**

Mar 04 2014, 10:01 am

**CLERK**
of the supreme court,
court of appeals and
tax court

# FOR PUBLICATION

ATTORNEYS FOR APPELLANT:

**TODD L. PADNOS**
**DANIELLE T. KENNEDY**
Sheppard Mullin Richter & Hampton, LLP
San Francisco, California

**JAN M. CARROLL**
**SEAN P. BURKE**
Barnes & Thornburg LLP
Indianapolis, Indiana

ATTORNEY FOR AMICUS CURIAE
INDIANA LAND TITLE ASSOCIATION, INC:

**THOMAS E. WHEELER, II**
Frost Brown Todd LLC
Indianapolis, Indiana

ATTORNEYS FOR AMICUS CURIAE
THE INDIANA LEGAL FOUNDATION:

**STEVEN M. BADGER**
**LEAH N. WILSON**
Benesch Friedlander Coplan & Aronoff LLP
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**WADE D. FULFORD**
Indiana Department of Insurance
Indianapolis, Indiana

**GREGORY F. HAHN**
**BRYAN H. BABB**
**KEVIN M. QUINN**
**JOEL T. NAGLE**
Bose McKinney & Evans LLP
Indianapolis, Indiana

ATTORNEYS FOR AMICUS CURIAE
NATIONAL ASSOCIATION OF
INSURANCE COMMISSIONERS:

**KARL L. MULVANEY**
**MARGARET M. CHRISTENSEN**
Bingham Greenebaum Doll LLP
Indianapolis, Indiana

ATTORNEY FOR AMICUS CURIAE
UNITED POLICYHOLDERS:

**STEPHEN J. PETERS**
Harrison & Moberly, LLP
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

COMMONWEALTH LAND TITLE                )
INSURANCE COMPANY,                     )
                                       )
    Appellant-Petitioner,              )
                                       )

)

STEPHEN W. ROBERTSON, INSURANCE )
COMMISSIONER OF THE STATE OF )
INDIANA, in his official capacity only and not )
in his individual capacity, on behalf of the )
INDIANA DEPARTMENT OF INSURANCE, )

)

      Appellee-Respondent.      )

---

**APPEAL FROM THE MARION SUPERIOR COURT**
The Honorable Michael D. Keele, Judge
Cause No. 49D07-1112-PL-48514

---

**March 4, 2014**

**OPINION - FOR PUBLICATION**

**CRONE, Judge**

## Case Summary

The Indiana Department of Insurance ("IDOI") conducted a targeted market examination of Commonwealth Land Title Insurance Company ("Commonwealth") to determine if it was in compliance with the Indiana Insurance Code. Following the examination, the IDOI issued an order ("the Administrative Order"), concluding that Commonwealth violated Indiana Code Sections 27-4-1-4(a)(7)(C)(i) ("the Rate Statute"), 27-1-3-4 ("the Unsafe Business Practices Statute"), and 27-1-18-2 ("the Gross Premium Tax Statute"), and ordered Commonwealth to take certain actions to cure its violations pursuant

2

to Indiana Code Section 27-1-3.1-11 ("the Cure Statute"). Commonwealth petitioned for judicial review, and the trial court upheld the Administrative Order with one exception.

Commonwealth appeals the trial court's order, arguing that the IDOI's determinations that it violated the aforementioned statutes are unsupported by substantial evidence and that the cures the IDOI ordered are not authorized by the Cure Statute. We conclude that Commonwealth fails to carry its burden to show that the IDOI's determinations are unsupported by substantial evidence and that the cures are not authorized by the Cure Statute. Accordingly, we affirm the trial court's order.

**Facts and Procedural History**

Commonwealth is licensed to write title insurance in Indiana and has an administrative office in Jacksonville, Florida. During all times relevant to this appeal, Commonwealth marketed title insurance in Indiana solely through independent non-affiliated agents that sold Commonwealth's title insurance pursuant to written agency agreements.

On September 11, 2009, the IDOI issued an examination warrant to Commonwealth, informing it that it would be the subject of a Targeted Market Conduct Examination ("the Examination") covering its title insurance transactions occurring in Indiana from January 1, 2005, to January 1, 2010. The stated purpose of the Examination was to determine whether Commonwealth (1) "permitted excessive charges and/or unfair discrimination in the amount of premiums charged to Indiana policyholders by their agents," (2) complied with the Real Estate Settlement Procedures Act ("RESPA") involving consumer disclosure requirements on HUD-1 Settlement Statements ("HUD-1 Statement"), and (3) "accurately reported the

3

premium tax due on title insurance charges to Indiana policyholders for title insurance." Appellant's App. at 331.

By way of background, the HUD-1 Statement is a disclosure form completed by the agent pursuant to the issuance of a real estate mortgage on which all charges imposed upon the borrower and seller by the lender are itemized.[1] RESPA requires that the title insurance premium be disclosed on a HUD-1 Statement at mortgage closing. At all times relevant to this appeal, title insurance agents reported the title insurance premium on line 1108 of the HUD-1 Statement. Prior to January 1, 2010, the regulations governing the HUD-1 Statement permitted the amount reported on line 1108 to include costs for settlement services such as costs of researching the title or conducting the closing in addition to the premium for title insurance. Commonwealth refers to this undifferentiated amount as a "bundled charge." Appellant's Br. at 9. Indiana is in practice a "risk rate" state, which means that the title insurance premium does not include the costs for settlement services. Appellant's App. at 564. The risk rate traditionally includes a commission to the agent that sells the insurance policy. *Id*. at 121. That is, the agent receives the premium from the policyholder, keeps a portion of it as a commission, and remits a portion to the insurer. *Id*.

The IDOI appointed Bose Government Strategies, LLC ("BGS"), to conduct the Examination. BGS conducted the Examination pursuant to the standards and procedures approved by the IDOI and the National Association of Insurance Commissioners ("NAIC")

---

[1] HUD refers to the United States Housing and Urban Development Agency. The HUD-1 Settlement Statement is required under section 4 of RESPA and 24 C.F.R part 3500 (Regulation X) of the Department of Housing and Urban Development regulations.

as required by Indiana law.[2]  The NAIC is the United States standard-setting and regulatory support organization, created and governed by the chief insurance regulators from all fifty states, the District of Columbia, and five United States territories.  Through the NAIC, state insurance regulators establish standards and best practices, conduct peer review, and coordinate regulatory oversight.

The Examination included a review of Commonwealth's operations and management, marketing and sales practices, underwriting and reporting practices, and producer licensing and agency relations.  BGS interviewed key personnel and reviewed Commonwealth's manuals, bulletins, agency agreements, agent audit program, audit files, HUD-1 Statements, remittance reports, and sample transaction files.  BGS contracted with Aon Global Risk Consulting ("Aon") to provide actuarial and statistical analysis.

During the Examination, Commonwealth produced a memo ("the CPT Memo") that described its "unique" program for pricing title insurance premiums, which it dubbed the "Cents Per Thousand" ("CPT") program.  *Id.* at 473-74.  The CPT Memo provided in relevant part as follows:

> [Commonwealth] has implemented a [CPT] program where an agent agrees to adhere to a special rate chart that sets forth only "remittance rates" which are to be paid to the underwriter.  An agent pays "remittance rate" dollars to the underwriter based on this chart rather than relying on a more traditional method of: 1) calculating "premium" for title insurance based on a "premium" rate chart; 2) calculating and deducting a certain percentage as the agent's commission; and 3) remitting the balance to the underwriter. …. Under [the CPT] program, the underwriter never knows the premium that the agent charged the customer – the underwriter and agent only agree on a "remittance rate." ….

---

[2]  Ind. Code § 27-1-3.1-9(a).

> [Commonwealth] has successfully devised a [CPT] program that … permits complete discretion and flexibility for an agent to set title insurance rates for transactions that it insures … and reduces state premium taxes paid by the underwriter. … [A]gency contracts in Indiana have been drafted to incorporate the term "remittance rate" as the only amount due to the underwriter. For purposes of reporting premium however, the agency channel has made a decision to report Indiana premium as a rate of $1.00 dollar per thousand. There does not appear to be any connection between [the] "remittance" rate which is the amount that the agent pays to the underwriter, and the fictional premium rate of $1.00 dollar per thousand. The $1.00 per thousand "premium" rate is not referenced in any agency contract, nor is it a reflection of any fee actually collected or charged for title insurance in Indiana. It does appear that this fictional $1.00 per thousand is used as a "gross premium" to report premium to Indiana for the purpose of calculating premium taxes. ….
>
> ….
>
> …. [I]f an agent reported only remittance amounts, it might be challenging for the underwriter to gather the actual premium rates charged on each transaction. Agents may prefer this program to a more traditional commission program because the agent has complete flexibility to quote prices to the consumers. …. [T]he benefit to the consumer under this totally open pricing model may be difficult to identify. … In today's heavily scrutinized regulatory environment, it might be challenging to defend this pricing strategy as consumer friendly.

*Id.* The CPT program was implemented by Commonwealth's Indiana State Agency Manager and Vice President Bryan Steckler. In December 2008, Fidelity National Financial, Inc., acquired Commonwealth and discontinued the CPT program.

BGS interviewed Steckler, who stated that each agent was responsible for determining the premium charged to consumers. Steckler also stated that "the premium charged to the consumer during the CPT program was not specifically tied to risk." *Id.* at 451. BGS also interviewed Vice President Eastern Division Manager Robert Wineman, who also advised that each agent determined the premium charged to the consumer and that Commonwealth

6

did not monitor the premiums charged to ensure that such premiums were fair and proper to the consumer. *Id*. at 460.

After learning of the implementation of the CPT program, BGS examined premium rates for transactions in which Commonwealth simultaneously issued a title insurance policy to a lender and to an owner. BGS and Aon examined ninety-seven transactions for the years 2005 through 2008 and 110 transactions for 2009. Aon compared "premiums charged on line 1108 of HUD-1" with the remittance amount reported by the independent agent. *Id*. at 452. Aon "used information obtained through [BGS's] review to determine variances between HUD-1 Premium and the Remit Total Premium and the implied result on underpaid and overpaid premium taxes for the Exam Period." *Id*. at 452. Aon's analysis showed that the HUD-1 premium was much higher than the remittance premium during 2005 through 2008. It also showed that Commonwealth underreported premiums for premium tax purposes for all years. Based on a comparison between the HUD-1 premium and the remittance premium, BGS and Aon calculated that Commonwealth underpaid an estimated $62,146 in premium taxes during the Examination period.

Aon also compared the HUD-1 premium against the premium reporting method under the CPT program, which also indicated that Commonwealth underreported premiums. This comparison showed that Commonwealth underpaid an estimated $54,115 in premium taxes during the Examination period.

During the Examination, Commonwealth produced another memo dated June 28, 2008, from Steckler to Commonwealth's agents ("the Steckler Memo") regarding completion

of HUD-1 Statements. The Steckler Memo noted that some agents itemized charges for title searches and other costs on the appropriate lines, whereas others bundled all the charges with the title premium on line 1108. The Steckler Memo instructed agents that entered a bundled charge on line 1108 to designate in the parenthetical section directly beneath it the various line items that were included in the bundled charge line 1108. *Id*. at 482, 604. The reason for requiring that the costs included in the bundled charge be identified was to insure that "we are all completing the HUD in a manner consistent with the way that it was intended to be filled out." *Id*.

Almost two years after commencing the Examination, BGS completed a draft market conduct examination report ("the Draft Report"). The IDOI delivered the Draft Report to Commonwealth on August 18, 2011, and informed it that it could respond to the Draft Report by submitting any records, documents, or papers, and by clarifying any business practices that BGS may have misinterpreted. *Id*. at 335-416. Commonwealth submitted a response to the Draft Report, arguing that the findings were erroneous and objecting to the recommendations, but it did not submit any records, documents, or papers. *Id*. at 417-26.

On September 22, 2011, BGS submitted a 138-page verified market conduct examination report ("the Final Report") to the IDOI, which contained ten sets of findings, conclusions, and recommendations. BGS attached twelve exhibits, including the CPT Memo, the Steckler Memo, a total premium report, remittance reports, a HUD-1 Statement, an agency contract, agency audit program premium rate reviews, Aon's calculations based on the HUD-1 Statements and remittance reports, Aon's calculations based on the HUD-1

Statements and the premium calculated as one dollar per one thousand dollars of coverage, and Aon's calculations comparing the markup for coverage for lower coverage amounts with larger coverage amounts. *Id*. at 427-511. Each finding in the Final Report provided the applicable statutes, explained the information gathered and the methodology used to analyze it with references to the relevant exhibits, and provided a conclusion as to whether Commonwealth violated any laws. Each conclusion was followed by a set of recommendations for curing the violations.

Commonwealth submitted a response to the Final Report, in which it responded to each of the ten findings and conclusions. It also attached its response to the Draft Report and its correspondence with the IDOI and BGS regarding requests for documents. *Id*. at 512-55.

On November 23, 2011, the IDOI issued the Administrative Order, in which it incorporated the Final Report and Commonwealth's response. The Administrative Order provides in relevant part as follows:

<u>The Cents Per Thousand Program</u>

….

39)     Under the CPT program, the underwriter never knows the premium that the agent charged the customer because both [Commonwealth] and agent have agreed on a remittance rate rather than a premium rate.

….

41)     By instituting the CPT program, [Commonwealth] intentionally created an environment where agents were not required to report to [it] the premiums actually charged to consumers, but rather, the agent only remitted a contractual amount to [it] based upon coverage amounts.

9

42)     The CPT program was intended as a way to allow agents to charge varying premiums to consumers based on factors such as the consumer's sophistication, property location, and negotiations, rather than the risk borne by [Commonwealth] in writing the title insurance.

43)     Further, the CPT program was intended to reduce the amount of premium tax [Commonwealth] paid to the State of Indiana.

….

45)     The CPT program does not require any direct correlation between the risk undertaken by [Commonwealth] and [the] cost of the policy the consumer pays on a specific piece of property.

46)     Under the CPT program, [Commonwealth] assumed the premium charged to consumers was one dollar per one thousand dollars ($1.00/$1,000) of coverage.

47)     There does not appear to be any connection between the "remittance" rate and the fictional premium rate of one dollar per one thousand dollars ($1.00/$1,000) of coverage.

Company Audits of Agents

….

52)     [Commonwealth] performed regular audits of its contracted agents from January 1, 2005 through December 31, 2009.

53)     When audits of agents revealed that premium rates charged to consumers differed from the one dollar per one thousand dollars, [Commonwealth] did not investigate further or amend its premium tax reporting.

….

Premium Tax Compliance

….

55)     Bryan Steckler, Indiana State Agency Manager and creator of the CPT program advised during an interview that [Commonwealth] determined the net

10

premium but the gross premium charged to the consumer was determined by the agent. He further stated in a sworn statement that the premium charged the consumer during the CPT program was not specifically tied to risk.

….

58) Agents must properly report premiums for a company to be in compliance with relevant statutes, laws and regulations. Through its audits of agents, [Commonwealth] had access to both remittance reports and HUD-1 settlement statements used in real estate transactions to determine if its agents were accurately reporting premiums charged.

59) [Commonwealth] was aware of the need to set out matters included in the amount listed on HUD-1 forms and provided educational material to the agents on proper completion of these forms [the Steckler Memo] but failed to ensure compliance with the procedure.

….

61) [Commonwealth] inconsistently tested premiums charged by agents during its audits of agency operations.

62) [Commonwealth] defines premium in its contracts as the gross amounts of all fees and charges for title insurance in respect to policies. Indiana law applies the Gross Premium Privilege tax on the gross amount of all premiums received by [Commonwealth] on policies of insurance covering risk.

63) [Commonwealth] created a scenario in which [it] did not collect accurate information from its agents regarding premiums charged to consumers and therefore could not accurately report premium[s] to the IDOI or properly submit premium tax as required by Indiana law.

….

72) [Commonwealth] underpaid premium taxes in an amount between $54,115 and $62,146 for the examination period.

73) Based on [Aon's] assumption [that] the CPT program was designed to properly consider [Commonwealth's] costs for such coverage amounts and [Aon's] analysis of the difference between the premium reported on the HUD-1 and the premium calculated using the CPT program, [Aon] determined [that] [Commonwealth's] mark-up on premiums charged to consumers for $0 -

11

$50,000 of coverage was 2.19 times higher than the mark-up in premiums charged to consumers for the $30,000 - $1,000,000 coverage range.

74)    Based on the [Final Report] and workpapers, the Commissioner has reason to believe that the underpayment of premium taxes occurred in years other than the examination period stated in the examination warrant.

….

79)    Findings of fact and conclusions made pursuant to any examination shall be prima facie evidence in any legal or regulatory action. Ind. Code § 27-1-3.1-9(e).

….

## CONCLUSIONS OF LAW

81)    [Commonwealth] violated [the Rate Statute and the Unsafe Business Practices Statute] by:

   a. Devising, allowing, and promoting an environment wherein it had no control over premiums charged to consumers for its title insurance by implementing the CPT program.

   b. Permitting the charging of greater premiums per thousand dollars of coverage to consumers on smaller coverage amounts than those who purchased policies covering higher amounts[.]

   c. Using the CPT program to allow agents to generate a fictitious premium not based on actuarial analysis at [Commonwealth] level.

   d. Engaging in a practice of entering into agreements where its agents were permitted to set the final pricing of premiums to the consumer, resulting in great variance of premiums throughout the State.

82)    [Commonwealth] violated [the Gross Premium Tax Statute] by failing to accurately determine and pay premium taxes on the gross amount of all premiums received by it on policies of insurance covering risks within this state[.]

12

….

## **ORDER**

….

2)      In order to cure [Commonwealth's] violations of Indiana law, it must take the following actions.

3)      [Commonwealth] shall insure compliance with Indiana rules, laws[,] and statutes through regular audits and incorporate premium charge analysis as part of its agency audit program.

4)      [Commonwealth] shall file premium rates and policy forms with the IDOI for approval under procedures required of general property and casualty insurance companies. …. [Commonwealth] shall not use any rates until the rates have been approved by the IDOI.

5)      [Commonwealth] shall provide educational materials to its agents regarding their duties and responsibilities relating to the use and charging of premium rates in [its] rate book or manual.

6)      [Commonwealth] shall audit the accuracy of HUD-1 and remittance reports for coverage amounts to ensure proper consumer disclosure.

7)      [Commonwealth] shall provide to [the IDOI] details of the actuarial analysis of premium rates or remittance rates charged to Indiana consumers during the period of this examination, January 1, 2005 through December 31, 2009[.]

8)      [Commonwealth] shall recalculate its premium tax liability to the State of Indiana for January 1, 2005 through December 31, 2009, based on amounts actually charged by its agents rather than amounts reported to it by its agents, and submit that payment, with appropriate interest and penalties, to the IDOI[.]

9)      [Commonwealth] shall calculate the premium tax due the State of Indiana back to January 1, 2000 through December 31, 2004, based on amounts actually charged by its agents rather than amounts reported to it by its agents, and submit that payment, with appropriate interest and penalties, to the IDOI[.]

….

13

11)    [Commonwealth] shall provide confirmation to the IDOI by December 23, 2011, that it has discontinued the use of the CPT program. [Commonwealth] is prohibited from using the CPT program in the future.

12)    [Commonwealth] shall incorporate premium charge analysis as part of its agency audit program.

*Id*. at 556-73 (citations and footnotes omitted).

Commonwealth filed a petition for judicial review of the Administrative Order and a memorandum in support thereof. Commonwealth also requested an order staying the enforcement of the Administrative Order pending final judgment of its petition, which the trial court granted. The IDOI filed a response and a brief in opposition to Commonwealth's petition. Commonwealth filed a reply memorandum in support of its petition.

Following oral argument on Commonwealth's petition and the parties' submissions of findings of fact and conclusions of law, on January 29, 2013, the trial court issued its findings of fact, conclusions of law, and order ("the Order"), upholding the Administrative Order except for the portion ordering Commonwealth to recalculate the premium tax due for the pre-examination period. Specifically, the Order concluded that the IDOI properly interpreted Indiana's insurance laws; that substantial evidence established that Commonwealth violated the Rate Statute, the Unsafe Business Practices Statute, and the Gross Premium Tax Statute; and that the IDOI ordered appropriate curative measures (except, as mentioned, the pre-examination tax recalculation requirement). The trial court also extended its previous order staying enforcement of the Administrative Order until the parties presented it with a copy of a final non-appealable order. Commonwealth appeals the trial court's order. Additional facts will be provided as necessary.

**Discussion and Decision**

**Standard of Review**

Pursuant to the Administrative Orders and Procedures Act "(AOPA)", the General Assembly has granted courts the power to review the actions of state government agencies, but the power of judicial review is limited. *Robertson v. Ticor Title Ins. Co. of Florida*, 982 N.E.2d 9, 18 (Ind. Ct. App. 2012), *trans. denied* (2013). A court may only set aside agency action that is

> (1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) contrary to constitutional right, power, privilege, or immunity; (3) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; (4) without observance of procedure required by law; or (5) unsupported by substantial evidence.

Ind. Code § 4-21.5-5-14(d). "A decision is arbitrary and capricious when it is made without any consideration of the facts and lacks any basis that may lead a reasonable person to make the same decision made by the administrative agency." *Ind. Dep't of Envtl. Mgmt. v. Schnippel Constr., Inc.*, 778 N.E.2d 407, 412 (Ind. Ct. App. 2002), *trans. denied* (2003). "The burden of demonstrating the invalidity of agency action is on the party to the judicial review proceeding asserting invalidity." Ind. Code § 4-21.5-5-14(a); *see also Ind. Dep't of Envtl. Mgmt. v. Conard*, 614 N.E.2d 916, (Ind. 1993) ("The party challenging the administrative order bears the burden of showing that there are no substantial facts to support the agency's finding."). "Judicial review of disputed issues of fact must be confined to the agency record for the agency action[.] The court may not try the cause de novo or substitute its judgment for that of the agency." Ind. Code § 4-21.5-5-11.

A reviewing court grants deference to the administrative agency's findings of fact, but no such deference is accorded to the agency's conclusions of law. However, an interpretation of statutes and regulations by the administrative agency charged with enforcing those statutes and regulations is entitled to great weight, and the reviewing court should accept the agency's reasonable interpretation of such statutes and regulations, unless the agency's interpretation would be inconsistent with the law itself. Indeed, when a court determines that an administrative agency's interpretation is reasonable, it should terminate its analysis and not address the reasonableness of the other party's interpretation. Terminating the analysis recognizes the general policies of acknowledging the expertise of agencies empowered to interpret and enforce statutes and increasing public reliance on agency interpretations.

*Ind. Dep't of Envtl. Mgmt. v. Steel Dynamics, Inc.*, 894 N.E.2d 271, 274 (Ind. Ct. App. 2008) (citations, quotation marks, and footnote omitted), *trans. denied* (2009).

As for our review of the trial court's order, "to the extent the trial court's factual findings were based on a paper record, this Court conducts its own de novo review of the record. If the trial court holds an evidentiary hearing, this Court defers to the trial court to the extent its factual findings derive from the hearing." *Equicor Dev., Inc. v. Westfield-Washington Twp. Plan Comm'n*, 758 N.E.2d 34, 37 (Ind. 2001) (citation omitted). Here, the trial court held a hearing at which the parties presented oral argument in support of their positions, but it was not an evidentiary hearing. Consequently, we owe no deference to the

trial court's findings of fact.[3]  We apply de novo review to questions of law, and owe no deference to the trial court on such inquiries.  *Kiel Bros. Oil Co. v. Ind. Dep't of Envtl. Mgmt.*, 819 N.E.2d 892, 902 (Ind. Ct. App. 2004), *trans. denied* (2005).

## Section 1- Interpretation of Relevant Statutes

Commonwealth contends that the trial court erred in accepting the IDOI's interpretations of the Rate, Unsafe Business Practices, Gross Premium Tax, and Cure Statutes.  We observe that

> [a]n interpretation of a statute by an administrative agency charged with the duty of enforcing the statute is entitled to great weight, unless this interpretation would be inconsistent with the statute itself. .... Deference to an agency's interpretation of a statute becomes a consideration when a statute is ambiguous and susceptible of more than one reasonable interpretation. When a court is faced with two reasonable interpretations of a statute, one of which is supplied by an administrative agency charged with enforcing the statute, the court should defer to the agency.  If a court determines that an agency's interpretation is reasonable, it should terminate its analysis and not address the reasonableness of the other party's proposed interpretation. Terminating the analysis recognizes the general policies of acknowledging the expertise of agencies empowered to interpret and enforce statutes and increasing public reliance on agency interpretations.  However, an agency's incorrect

---

[3] The parties debate our standard of review.  Their debate appears to conflate the proper standard of appellate review of a trial court's findings of fact with that of a judicial court's review of an administrative agency's findings of fact.  To be clear, although we review the trial court's findings of fact de novo in this case because the trial court's Order is based on a paper record, our review of the IDOI's findings of fact is subject to Indiana Code Section 4-21.5-5-14(d), which provides that we may not set aside an administrative order unless it is unsupported by substantial evidence, and  Indiana Code Section 4-21.5-5-11, which provides that we will not try the cause de novo or substitute our judgment for that of the agency.  The cases cited by Commonwealth that it argues support de novo review of an administrative agency's findings of fact are inapposite because they all refer to appellate review of *trial court decisions* based on a paper record.  *See Wayne Cnty. Prop. Tax Assessment Bd. of Appeals v. United Ancient Order of Druids-Grove No. 29*, 847 N.E.2d 924, 926 (Ind. 2006); *Equicor*, 758 N.E.2d at 37; *First Am. Title Ins. Co. v. Robertson*, 990 N.E.2d 9, 11-12 (Ind. Ct. App. 2013), *trans. granted*.  To the extent that Commonwealth argues that it was denied an evidentiary hearing, it does not assert that it ever requested a hearing.  Although the IDOI had the discretion to call for an investigatory hearing, it was not required to do so. *See* Ind. Code § 27-1-3.1-11(a) (permitting the commissioner to adopt the examination report, reject it with directions to reopen the examination to obtain additional information, or call for an investigatory hearing).  Commonwealth does not deny that it was offered an opportunity to provide rebuttal and/or explanatory evidence in response to both the Draft Report and the Final Report.

interpretation of a statute is entitled to no weight. If an agency misconstrues a statute, there is no reasonable basis for the agency's ultimate action and the trial court is required to reverse the agency's action as being arbitrary and capricious.

*Pierce v. State Dep't of Corr.*, 885 N.E.2d 77, 89 (Ind. Ct. App. 2008) (citations and quotation marks omitted).

The primary goal in statutory construction is to determine, give effect to, and implement the legislature's intent. To effectuate legislative intent, we read the sections of an act together in order that no part is rendered meaningless if it can be harmonized with the remainder of the statute. [T]he statute or regulation must be construed as a whole looking to its object and policy. Words and phrases are taken in their plain, ordinary, and usual meaning unless a different purpose is manifested by the statute. Further, we presume that the legislature intended logical application of the language used in the statute, so as to avoid unjust or absurd results.

*Dev. Serv. Alts., Inc. v. Ind. Family & Social Servs. Admin.*, 915 N.E.2d 169, 181 (Ind. Ct. App. 2009) (citations and quotation marks omitted), *trans. denied* (2010). To the extent that Commonwealth specifically challenges the IDOI's interpretation of the statutes and presents its own interpretation, we will address these in the following sections. [4]

---

[4] Commonwealth contends that the trial court erred in failing to engage in any analysis of the Rate, Unsafe Business Practices, and Gross Premium Tax Statutes. Appellant's Br. at 16. We disagree. The trial court set forth the appropriate standard of review and found that to the extent that the parties offered differing interpretations of the statutes, the IDOI's interpretation of the statutes was reasonable and therefore terminated its analysis. Appellant's App. at 25, 26, and 28 (conclusions 9, 10, 14, 20, and 25). Commonwealth claims that the trial court erred by deferring to the IDOI's interpretation of the statutes because "[w]hile it is settled law that an agency's interpretation of its statutes is entitled to deference, such deference is appropriate only when the interpretation is found to be consistent with the statute itself." Appellant's Br. at 17 (citing *Dev. Serv. Alts.*, 915 N.E.2d at 181). We fail to see how the trial court could have concluded that the IDOI's interpretation of the statutes was reasonable without first applying the rules of statutory construction and concluding that the IDOI's interpretation was consistent with the statute.

**Section 2 - The Rate Statute**

Commonwealth argues that the trial court erred in upholding the IDOI's conclusion

that Commonwealth violated the Rate Statute. The Rate Statute prohibits title insurers from

> (7) Making or permitting any of the following:
>
> ….
>
> (C) Excessive or inadequate charges for premiums, policy fees, assessments, or rates, or making or permitting any unfair discrimination between persons of the same class involving essentially the same hazards, in the amount of premiums, policy fees, assessments, or rates charged or made for:
>
> > (i) policies or contracts of reinsurance or joint reinsurance, or abstract and title insurance.

Ind. Code § 27-4-1-4(a)(7)(C)(i).

> The trial court concluded that
>
> the administrative record establishes that Commonwealth violated the Rate Statute when its agents sold Commonwealth's title insurance policies to Indiana consumers under the CPT program and charged premiums not based on actual risk rates but instead based upon the agent's unfettered discretion in ascertaining factors such as the consumer's sophistication, property location, and negotiations, rather than the risk borne by Commonwealth.

Appellant's App. at 26.

Commonwealth contends that there is no evidence in the record that it charged an

excessive rate and that the Administrative Order lacks any finding that it charged an

excessive rate. Commonwealth's argument ignores the Final Report, which included

numerous exhibits, detailed explanations of BGS's and Aon's methods of analyzing the data,

and the conclusions drawn therefrom.[5] The exhibits included the CPT Memo and an agency agreement, and the findings included information provided during interviews with Commonwealth representatives. Steckler told BGS that the premiums charged to the consumer during the CPT program were not specifically tied to risk. Steckler and Wineman told BGS that the agents determined the premium charged to the consumer, and Wineman stated that Commonwealth did not monitor the premiums to ensure that they were fair and proper. The Final Report reached the following relevant conclusions: (a) Commonwealth "has created a scenario in which [it] does not collect accurate information from its agents regarding premiums charged to consumers for title insurance coverage, and in which [it] does not oversee gross premiums charged by agents to consumers;" (b) there were discrepancies between the policy coverage amounts reported on HUD-1 Statements and the coverage amounts agents reported on agent remittance reports, so that Commonwealth could not determine whether an agent properly reported the premium charged to the consumer; (c) Commonwealth had "allowed and promoted an environment wherein it has no control over premiums charged to consumers for its title insurance coverage and premiums charged to similar consumers for similar coverage can vary greatly;" (d) Commonwealth "has engaged in a practice of entering into agreements with agents wherein agents are permitted to set the

---

[5] Commonwealth does not suggest that the Final Report or the Draft Report were not in compliance with Indiana Code Section 27-1-3.1-10, which requires that all examination reports be comprised of only:
(1) facts:
    (A) appearing upon the books, records, or other documents of the company; and
    (B) ascertained from the agents or other persons examined, or as ascertained from the testimony of its officers or agents or other persons examined concerning the affairs of the company; and
(2) conclusions and recommendations that the examiners find reasonable warranted from those facts.

final pricing of premiums to the consumer, resulting in great variance of premiums throughout the State;" (e) Commonwealth had a wide range of commission agreements, premium rate sheets, and remittance sheets and does not monitor the gross premiums charged to consumers to ensure that the charges comply with relevant laws and regulations; (f) "[s]uch practices of allowing agents to have different remittance and commission rates contribute[] to an environment which rewards excessive, unfair and/or discriminatory pricing with the consumer;" and (g) Commonwealth "permits the charging of greater mark-ups in the HUD-1 ultimate premiums on lower coverage amounts than on higher coverage amounts." *Id*. at 451, 458, 460-62, 465. The Final Report contains ample evidence.

Commonwealth also argues that there is no evidence that it charged an unfairly discriminatory rate because the IDOI ignored the "of the same class" element in the Rate Statute, which, Commonwealth argues, refers to premiums with the same underlying cost structure. Commonwealth fails to acknowledge that this argument was previously presented and rejected in *Ticor*, 982 N.E.2d 9. There, the IDOI conducted a target market examination of Ticor and ultimately found that it violated the Rate Statute by charging excessive and unfairly discriminatory premium rates. Ticor appealed, and the trial court vacated the IDOI's administrative order, concluding in relevant part that "the Statutory Rate Standard is primarily a cost-based standard, requiring an analysis of an insurer's costs as the central determination regarding whether the premium or rate charged for the insurer's product is excessive or unfairly discriminatory." *Id*. at 17. The trial court further concluded that the IDOI's determination that Ticor charged premiums that were excessive and unfairly

21

discriminatory was improper as a matter of law because the examiner had not done an analysis of the agents' underlying costs in issuing such title insurance products. *Id*. at 17-18.

The IDOI appealed the trial court's order, arguing that the Rate Statute required title insurers to charge "comparable insurance premiums to insureds purchasing the same amount of title insurance." *Id*. at 19. The *Ticor* court concluded that the IDOI's interpretation of the Rate Statute was reasonable and that "Ticor violated the Rate Statute by allowing its agents to charge different premium rates to Indiana consumers that are of the same class and involve the same risk." *Id*. at 23 (citation and quotation marks omitted). The *Ticor* court reversed the trial court's order and reinstated the administrative order.

Commonwealth acknowledges in its reply brief that *Ticor* construed the Rate Statute, but asserts that *Ticor* is irrelevant because in this case the IDOI made no findings that Commonwealth's premiums were excessive or unfairly discriminatory.[6] In our view, *Ticor* directly addressed and rejected Commonwealth's argument that the underlying cost structure must be calculated to determine whether premiums were unfairly discriminatory.

Contrary to Commonwealth's assertion that the Administrative Order lacks findings that it charged excessive and unfairly discriminatory rates, findings 42, 45, 55, 63, 73, and conclusion 81(c) and -(d) are relevant to whether Commonwealth permitted excessive and unfairly discriminatory rates and thereby violated the Rate Statute. We conclude that Commonwealth has failed to carry its burden to show that the IDOI's determination that

---

[6] In stark contrast to its argument in this appeal, Commonwealth argued to the trial court that *Ticor* was dispositive. At that time, *Ticor* was favorable to Commonwealth's position because the trial court had ruled in favor of Ticor but our appellate opinion had not yet been handed down.

Commonwealth violated the Rate Statute is not supported by substantial evidence. Commonwealth also objects to the measures imposed to cure this violation, which we will address in Section 5 with its other objections related to the Cure Statute.

## Section 3 -The Unsafe Business Practices Statute

Commonwealth challenges the trial court's decision upholding the IDOI's conclusion that Commonwealth violated the Unsafe Business Practices Statute, which provides,

Every insurance company to which this article is applicable:

(1) shall conduct and transact its business in a safe and prudent manner;
(2) shall maintain such company in a safe and solvent condition; and
(3) shall establish and maintain safe and sound methods for the conduct of such insurance company and its business and prudential affairs.

Ind. Code § 27-1-3-4.

The trial court made the following relevant conclusions:

17. [T]he administrative record establishes that Commonwealth violated the Unsafe Business Practices Statute by entering into agreements where its agents were permitted to set the final pricing of premiums to the consumers, resulting in great variance of premiums throughout the State utilizing a Cents per Thousand program that generated fictitious premium[s] not based on actuarial analysis at Commonwealth's level.

18. Moreover, Commonwealth failed to properly determine insurability and did not use sound underwriting practices when issuing certain policies, and also failed to audit its agents, or require them to maintain accurate records, so that in many instances the examiners had no way of determining what premiums Commonwealth agents had actually charged Indiana consumers.

19. The IDOI's determination that Commonwealth violated the Unsafe Business Practices Statute is consistent with the NAIC standard that "wide scale application of incorrect rates" are "indicative of inadequate management oversight." NAIC, Market Regulation Handbook 346 (2011).

Appellant's App. at 27 (citations, quotation marks, and brackets omitted).

Commonwealth refers to the Unsafe Business Practices Statute as the Insolvency Statute, and argues that there is no evidence that it "was operating its business in [a] fashion that jeopardized its solvency." Appellant's Br. at 32.[7] The underlying unstated assumption of this argument is that the Unsafe Business Practices Statute applies only to solvency concerns, but Commonwealth fails to articulate why the statute should be so limited. Commonwealth's argument ignores item 3, which requires safe and prudent business practices and item 4, which requires safe and sound methods for conducting business and prudential affairs. The NAIC states that "Market regulation is regulatory oversight that primarily focuses on regulated entities' compliance with laws and regulations other than those related to financial solvency. Market regulation complements financial solvency regulation." *Market Conduct Regulation*, http://www.naic.org/cipr_topics/topic_market_ conduct_regulation.htm (last visited Feb. 6, 2014). Accordingly, we do not accept the assumption that the IDOI was required to make findings that Commonwealth's business practices threatened its solvency in order to determine that it violated the statute.

Commonwealth also argues that the trial court improperly relied upon conclusory statements in the Administrative Order and that there is no evidence in the record to support

---

[7] The IDOI asserts that Commonwealth did not present this argument to the trial court, and therefore it is waived. In its reply brief, Commonwealth argues that it "asserted below that the Insolvency Statute 'pertains to fiscal management and solvency.'" Appellant's Br. at 18 (citing Appellant's App. at 134). Whether this single statement constitutes an argument is questionable, but given our preference for determining issues on the merits, we will address Commonwealth's solvency argument.

the finding that it violated the Unsafe Business Practices Statute. To the contrary, the administrative record includes the CPT Memo and other evidence relating to the CPT program. In addition, the Final Report concluded that "Commonwealth inconsistently tested premiums charged by agents during its audit of agency operations" and that Commonwealth "has created a scenario in which [it] does not collect accurate information from its agents regarding premiums charged to consumers for title insurance coverage, and in which [it] does not oversee gross premiums charged by agents to consumers." Appellant's App. at 448, 451. Commonwealth argues that it is not required by law to audit its agents. Setting aside the issue of whether Commonwealth is legally required to audit its agents, the fact is that it *did* audit its agents, and it is the manner in which it performed those audits which the IDOI found to violate the Unsafe Business Practices Statute. The IDOI points out that Commonwealth does not and cannot deny that its poor record keeping and auditing are not safe and prudent. We conclude that Commonwealth has failed to carry its burden to show that the IDOI's determination that Commonwealth violated the Unsafe Business Practices Statute is not supported by substantial evidence. We will address Commonwealth's objections to the measures imposed to cure this violation in Section 5.

## Section 4 - The Gross Premium Tax Statute

Commonwealth claims that the trial court erred in upholding the IDOI's determination that it violated the Gross Premium Tax Statute, which provides in relevant part,

> Every insurance company not organized under the laws of this state … and doing business within this state shall, on or before March 1 of each year, report to the department, under the oath of the president and secretary, the gross

amount of all premiums received by it on policies of insurance covering risks within this state.

Ind. Code § 27-1-18-2.  Premium is defined as

money or any other thing of value paid or given in consideration to an insurer, insurance producer, or solicitor on account of or in connection with a contract of insurance and shall include as a part but not in limitation of the above, policy fees, admission fees, membership fees and regular or special assessments and payments made on account of annuities.

Ind. Code § 27-1-2-3(w).

Commonwealth asserts that there is no evidence in the administrative record that it received premiums other than the amounts actually remitted to it by its agents as reflected in the agent remittance reports.  Commonwealth's argument confuses the remittance amount with "the gross amount of all premiums."  Ind. Code § 27-1-18-2.  Commonwealth's agency agreements provide that "[a]gent shall be responsible for the collection of the gross amounts of all fees and charges for title insurance in respect to [of] Policies issued by AGENT (Hereinafter termed "Premiums")," and "[u]pon collection of Premiums by Agent, [Commonwealth] shall be deemed *the owner of the entire amount* thereof."  Appellant's App. at 575 (emphasis added).  Thus, pursuant to its own agency agreements, "the gross amount of all premiums" received by Commonwealth was the gross premiums collected by their agents, not the remittance amount.  As such, the amount in the agency remittance reports is irrelevant in determining whether Commonwealth paid the correct amount of gross premium tax.  We conclude that Commonwealth has failed to carry its burden to show that the IDOI's determination that Commonwealth violated the Gross Premium Tax Statute is not supported

26

by substantial evidence.[8]  We will address Commonwealth's objections to the measures imposed to cure this violation in the following section.

## Section 5 - The Cure Statute

Commonwealth contends that the trial court erred in failing to interpret the Cure Statute or enter any conclusions of law as to the IDOI's interpretation of such statute.  The Cure Statute provides, "If the examination report reveals that the company is operating in violation of any law, regulation, or prior order of the commissioner, the commissioner may order the company to take *any action* the commissioner considers *necessary and appropriate* to cure that violation."[9]  Ind. Code § 27-1-3.1-11 (emphases added).  The crux of the parties' debate is whether "any action" authorizes the particular cures ordered by the IDOI.

## Section 5.1 - Cures Imposed for Violation of the Rate Statute

First, Commonwealth contends that the trial court erred in concluding that the IDOI was authorized to require that Commonwealth file its premium rates with the IDOI for approval.  Commonwealth contends that "any action" cannot as a matter of law include the requirement that it seek rate approval from the IDOI because title insurers are specifically exempted from such an obligation.  According to Commonwealth, Chapter 22 of Article I of

---

[8] Commonwealth also argues that where the agent provided a bundled charge on line 1108 of the HUD-1 Statement, the IDOI had to make certain assumptions as to which portion of the amount was sales commission versus settlement charges.  Appellant's Br. at 38.  The IDOI asserts that Commonwealth raises this argument for the first time on appeal, and therefore it is waived.  We agree.  *See GKC Indiana Theatres, Inc. v. Elk Retail Investors, LLC*, 764 N.E.2d 647, 652 (Ind. Ct. App. 2002) ("A party generally waives appellate review of an issue or argument unless the party raised that issue or argument before the trial court.").

[9] The language follows NAIC's Model Law on Examinations verbatim.  NAIC, Model Laws, Regulations and Guidelines 390-4 (2012).

the Insurance Code ("the Rate Regulation Chapter") requires property and casualty insurers to "file with the commissioner every manual of classifications, rules, and rates, every rating schedule, every rating plan, and every modification of any of the foregoing which it proposes to use." Ind. Code § 27-1-22-4(a). However, Commonwealth contends, title insurers are specifically exempted from the requirement to files their rates with the IDOI for approval because Indiana Code Section 27-1-22-2(a)(6) specifically provides that the Rate Regulation Chapter does not apply to title insurers.

Commonwealth's argument fails to acknowledge that effective July 1, 2013, the General Assembly amended Section 27-1-22-2(a) to add title insurers to the list of insurers subject to the Rate Regulation Chapter and deleted subsection (6).[10] Pub. Law 80-2013, § 1. Thus, as of today, title insurers are statutorily required to file rates for approval (the IDOI refers to this as "file and use"). Commonwealth asserts that this file and use regime does not equate with the Administrative Order's imposition of a prior approval regime (referred to as "file and approve"). However, the General Assembly added Section 27-1-22-28(d), which provides that for policies issued after June 30, 2014, title insurers will be required to file rates for approval prior to implementing them. Pub. Law 80-2013, § 2. The IDOI agrees that if this appeal concludes before June 30, 2014, it will waive the right to require Commonwealth to obtain prior approval of its rates. Appellee's Br. at 51 n.10. Accordingly,

---

[10] Indiana Code Section 27-1-22-2(a) now reads, "This chapter applies to … all forms of title insurance."

28

Commonwealth's argument against the requirement that it file its rates for prior approval is moot.

Commonwealth also argues that the trial court erred in concluding that the IDOI had the authority to require Commonwealth to perform a retrospective actuarial analysis of its rates. Commonwealth argues that the Cure Statute does not authorize the IDOI to require it to perform a retrospective actuarial analysis of its rates because "[n]othing within this language authorizes the IDOI to require compliance with obligations beyond those contained within the Insurance Code." Appellant's Br. at 26. The IDOI argues that the plain language of the Cure Statute demonstrates that the General Assembly did not intend to limit the IDOI's authority in the manner Commonwealth asserts. We agree with the IDOI.

As previously stated, the Cure Statute provides that "the commissioner may order the company to take *any action* the commissioner considers *necessary and appropriate* to cure that violation." Ind. Code § 27-1-3.1-11 (emphases added). The plain, ordinary, and usual meaning of the word "any" does not even remotely suggest that the actions the IDOI may order are limited solely to those that are specifically required by statute.[11] However, the IDOI does not contend that its curative power is unlimited. The Cure Statute requires that any action ordered by the IDOI must be "necessary and appropriate" to cure the violation. We

---

[11] Commonwealth asserts that the Insurance Code provides the IDOI with specific measures it can order a title insurer to take upon finding a violation, citing Indiana Code Section 27-4-1-6, which provides that following a hearing under Indiana Code Section 4-21.5-3, the IDOI *shall* order the insurer to cease and desist the conduct found to violate the Code *and may* (1) order the insurer to pay fines and penalties and (2) suspend or revoke an insurer's license. Not surprisingly, these severe measures may not be imposed absent a hearing. Presumably, the Cure Statute provides authority for the IDOI to order less severe actions where a hearing is not required. If the legislature had intended to limit the IDOI to the measures listed in Section 27-4-1-6 and to measures already legally required, it would have not have used "any action" in the Cure Statute.

conclude that the IDOI's interpretation of the Cure Statute is reasonable and terminate our analysis.

Commonwealth next contends that because the CPT program has been discontinued, a retrospective actuarial analysis of its rates is unnecessary. The IDOI asserts that a retrospective actuarial analysis is necessary and appropriate to cure Commonwealth's violation of the Title Rate Statute because (1) the Examination was based on a mere sampling of transactions and (2) Commonwealth's poor auditing hindered an accurate assessment of the actual rates charged to consumers, and therefore additional violations of the Insurance Code could have occurred when the CPT program was in effect. We agree with the IDOI. We conclude that Commonwealth failed to carry its burden to show that the IDOI does not have authority under the Cure Statute to order it to perform a retrospective actuarial analysis of its rates.

**Section 5.2 - Cures Imposed for Violation of the Unsafe Business Practices Statute**

Commonwealth next challenges the IDOI's requirement that it audit its agents as a curative measure for its violation of the Unsafe Business Practices Statute. The trial court concluded as follows:

> 28. The Commissioner was within his authority to order that Commonwealth shall ensure compliance with Indiana rules, laws and statutes through regular audits, including *auditing the accuracy of HUD-1 and remittance reports for coverage amounts* to ensure proper consumer disclosure of amounts charged, and also incorporating *a premium charge analysis as part of its agency audit program.* In effect this is nothing more than a directive for Commonwealth to ensure that its agents properly fill out one of Commonwealth's already existing forms, which also requires the "test of remittances in states like Indiana be based upon the schedule of rates in the agent's contract.

Appellant's App. at 29 (emphasis added) (citations omitted).

Commonwealth contends that title insurers are not required to audit independent title professionals, citing *Fidelity National Title Insurance Co. v. Mussman*, 930 N.E.2d 1160 (Ind. Ct. App. 2010), *trans. denied* (2011). Commonwealth recognizes that in *Mussman*, this Court "held that, while an independent title professional was a title insurer's agent for purposes of issuing title insurance policies, it was not the title insurer's agent for other purposes, such as providing escrow and closing services." Appellant's Br. at 36. Given that an independent title professional is a title insurer's agent for purposes of issuing title insurance and that Commonwealth was ordered only to audit the accuracy of HUD-1 Statements and remittance reports for the amount of title insurance coverage to confirm that consumers were charged the correct premium according to its schedule of rates, Commonwealth fails to persuade us that this cure is not necessary and appropriate.

Commonwealth also argues that the IDOI is not authorized to order it to incorporate premium charge analysis as part of its agency audit program. The trial court concluded, and Commonwealth does not contest, that the premium charge analysis means nothing more than that Commonwealth insure that its agents fill out one of its already existing forms. Commonwealth fails to persuade us that the IDOI does not have authority to order it to audit its agents utilizing premium charge analysis.

**Section 5.3 - Cures Imposed for Violation of the Gross Premium Tax Statute**

Lastly, Commonwealth challenges the order to recalculate its premium tax liability for the Examination period based on amounts actually charged by its agents. Commonwealth

asserts that it has already paid the larger estimated amount of premium tax due, and therefore an audit of every title insurance transaction during the Examination period is excessive and unnecessary. Commonwealth's argument ignores the reason that the trial court upheld this cure. The trial court concluded,

> 32.     Finally, the [IDOI] was within [its] authority to order Commonwealth to recalculate its premium taxes, paying the appropriate amount (with appropriate interest and penalties, if applicable for the Examination period. Although Commonwealth has remitted the disputed amount of allegedly underpaid premium calculated by the [IDOI], along with interest and penalties, this payment was based on a sampling of Commonwealth's files during a market conduct examination, as opposed to a recalculation of premium taxes potentially due and owing as a result of every actual transaction.

Appellant's App. at 30 (citations and quotation marks omitted). The CPT program, by its own terms, "reduces state premium taxes paid by the underwriter," and BGS looked only at a sample of transactions. *Id*. at 473. Therefore, Commonwealth has failed to carry its burden to show that it is not necessary or appropriate for it to determine the actual amount of premium taxes that was due. We conclude that the IDOI was within its authority to order Commonwealth to recalculate its premium tax liability for the Examination period.

## Conclusion

We conclude that substantial evidence supports the IDOI's determination that Commonwealth violated the Rate Statute, the Unsafe Business Practices Statute, and the Gross Premium Tax Statute. We further conclude that the cures imposed by the IDOI for Commonwealth's violations of these statutes are authorized by the Cure Statute. Therefore, we affirm the trial court's order.

32

Affirmed.

BARNES, J., and PYLE, J., concur.